## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| JOHN SOLAK, derivatively on behalf of ENOCHIAN BIOSCIENCES INC., <br><br> Plaintiff, <br><br> SERHAT GUMRUKCU, RENE SINDLEV, MARK DYBUL, M.D., GREGG ALTON, CAROL L. BROSGART, M.D., HENRIK GRØNFELDT-SØRENSEN, JAYNE MCNICOL, and JAMES SAPIRSTEIN, <br><br> Defendants, <br><br> -and- <br><br> ENOCHIAN BIOSCIENCES INC., a Delaware corporation, <br><br> Nominal Defendant. | Civil Action No. 1:23-cv-00065-GBW <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> <u>**PUBLIC VERSION OF D.I. 2**</u> <br> <u>**FILED FEBRUARY 3, 2023**</u> |

Plaintiff, John Solak, by his attorneys, submits this Verified Shareholder Derivative Complaint in the name of, and on behalf of, nominal defendant Enochian BioSciences Inc. ("Enochian," or the "Company") against certain directors and officers of Enochian for Breaches of Fiduciary Duty, and violations of Section 14(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review and analysis of: (i) regulatory filings made by Enochian with the United States Securities and Exchange Commission ("SEC"); (ii) wire and press releases published by and regarding the Company, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet; (iii) pleadings and responsive

filings in the related securities class actions captioned *Chow v. Enochian Biosciences Inc.*, No. 22-cv-01374 (C.D. Cal.); (iv) documents obtained pursuant to 8 *Del. C.* § 220;[1] and (v) other publicly-available information, including media and analyst reports concerning Enochian. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1.      This is action is brought derivatively on behalf of Enochian to recover the substantial damages caused by the misconduct, mismanagement, and lack of oversight pled herein and to remediate its internal control weaknesses and deficient corporate governance practices and procedures.

2.      Enochian was formed on May 19, 2017, as part of a business partnership forged between Defendants Rene Sindlev ("Sindlev") and Serhat Gumrukcu ("Gumrukcu"). It was represented that Enochian was engaged in developing technology for the treatment of HIV/AIDS, hepatitis B virus, influenza, coronavirus, and cancer based upon the scientific research of Gumrukcu. In exchange for a perpetual license for technologies from entities controlled by him, Gumrukcu obtained 50% ownership of the surviving company, Enochian.

3.      In public statements and filings with the SEC, Enochian has credited Gumrukcu with being the "genius" "inventor" of the technology and science serving as the basis for the

---

[1]    It is reasonable to infer that exculpatory information not reflected in the document production does not exist. *See Teamsters Local 443 Health Serv's & Ins. Plan v. Chou*, C.A. No. 2019-0816-SG, 2020 WL 5028065, at *24 n.314 (Del. Ch. Aug. 24, 2020).

Company's product pipeline. In fact, Gumrukcu's research serves as the foundation for most, if not all, of Enochian's pipeline.[2]

4.      As recently as January 2022, the Company's CEO, Dr. Mark Dybul ("Dybul"), disclosed in a shareholder letter, that "the ideas behind Enochian BioSciences' pipeline come from the inventor, Dr. Serhat Gumrukcu…."[3]  Gumrukcu was also the face of Enochian, giving every scientific presentation that was, until recently, listed on the Company's Investor Relations website since 2019.[4]

5.      Based on Enochian's disclosures, the Company and its pipeline are entirely dependent on Gumrukcu, who either licenses or has developed the research forming the basis for every product in the Company's pipeline.

6.      In fact, it is Plaintiff's position that Gumrukcu is the Company's controlling stockholder, as the leader of its controlling group—Gumrukcu (holder of 18.15% shares), his spouse, Anderson Wittekind (holder of 17.33% shares), his employee, Carl Sandler (holder of 6.68% shares), and affiliated entities have been granted ownership of about 42.16% of Enochian– the largest single stake in the Company.[5]

---

[2]    In fact, the Company's only product not developed by Gumrukcu–and its only clinical stage product–is ENO-4001, which was developed by its predecessor, Dandrit Biotech ApS, in 2001. Notwithstanding, on June 29, 2018, the Board was told that "ENO-3001 and ENO-4001 had been rendered obsolete because of ENO-5001," one of Gumrukcu's products. ENO220-00361.

[3]    Dybul, *CEO's Letter to Shareholders*, ENOCHIAN BIOSCIENCES (Jan. 24, 2021), available at http://www.enochianbio.com/wpcontent/uploads/2022/01/Enochian-Shareholders-Letter_01.24.2021.pdf.

[4]    As of the date of this Complaint, all of Gumrukcu's presentations have been removed from Enochian's Investor Relations website.

[5]    Enochian, Schedule 14A Proxy Statement (Jan. 27, 2022), available at https://www.sec.gov/Archives/edgar/data/1527728/000173112222000109/e3449_def14a.htm.

7.     Internally, the Company's then-CEO, Eric Leire, MD ("Leire"), found that little could be verified about Gumrukcu's work regarding the drugs licensed by Enochian and Leire began to suspect that Gumrukcu had fabricated his resume and held neither a medical degree nor a doctoral degree. Leire, a medical doctor and pharmaceutical-industry executive, was fired from his CEO job on January 3, 2019.[6] While the Board's minutes provide no basis or explanation for his termination, Leire says he was fired after raising his concerns with the Enochian Board.[7] Since the same time, other red flags have also been raised–all relating to Gumrukcu and his development of the technology forming the basis for the Company's pipeline.

8.     Notwithstanding the red flags, the Company's reliance on Gumrukcu steadily grew, with Gumrukcu and his affiliates receiving nearly $25 million from Enochian in connection with the Framework Agreement, since November 15, 2019.[8]

9.     However, the Defendants' lies about Gumrukcu and his scientific "genius" really began to unravel when, on June 1, 2022, Hindenburg Research published a report based upon extensive research, including numerous interviews of former Enochian employees and industry experts (the "Hindenburg Report" or "Report"), which exposed Gumrukcu as a con-artist with a long rap-sheet, who possessed none of his claimed credentials.[9]

10.     In fact, Gumrukcu does not, and never has possessed a M.D., Ph.D., or any licensure to practice medicine in any jurisdiction. Rather, he had purchased a fake Russian medical

---

[6]     ENO220-00380.
[7]     Walker and Foldy, *Biotech Wizard Left a Trail of Fraud—Prosecutors Allege It Ended in Murder*, WSJ (June 27, 2022), available at https://www.wsj.com/articles/biotech-wizard-left-a-trail-of-fraudprosecutors-allege-it-ended-in-murder-11656339183.
[8]     Complaint ¶ 134, *Enochian BioSciences, Inc. v. Gumrukcu*, No. 22STCV34071 (Cal. Sup. Ct.).
[9]     *Miracle Cures and Murder For Hire: How A Spoon-Bending Turkish Magician Built A $600 Million Nasdaq-Listed Scam Based On A Lifetime Of Lies*, HINDENBURG RESEARCH (June 1, 2022) (the "Hindenburg Report").

degree on the black market and, in 2012, he was arrested in Turkey "based on accusations of falsely posing as a doctor." Further, Gumrukcu had a record of fraudulent financial transactions, including a February 2017 arrest in the State of California for 14 felonies–including charges of fraud, identity theft, and check kiting.

11.     Recently, it has come to light that Gumrukcu's criminality extends beyond financial crimes–he was arrested on charges of conspiracy to commit murder of a former business partner who had accused Gumrukcu of fraud. The former partner's fraud case was going to trial when the due diligence for Enochian's merger with DanDrit Biotech USA Inc. was nearly complete, and prosecutors allege that Gumrukcu conspired to have his former business partner murdered to keep his fraudulent conduct hidden, without interfering in the consummation of the enormously lucrative transaction.

12.     According to the Hindenburg Report, members of Enochian's Board of Directors ("Board") knew about Gumrukcu's criminal and fraudulent past, but knowingly withheld that information from the Company's stockholders. In fact, despite his failure to disclose any relevant information prior to June 2022, Sindlev admitted to knowing that the Company's founder, Gumrukcu, had been charged with 14 felony counts related to fraud before: (i) consummating the business transaction between Enochian and Dandrit; (ii) bringing the resulting Company public; (iii) increasing the Company's reliance on Gumrukcu; and (iv) awarding Gumrukcu and his affiliates lucrative consulting and licensing contracts.

13.     Though Gumrukcu's criminal past was known, no disclosure was made–instead, the Company issued seemingly endless assertions about Gubrukcu's "genius," lavished him with praise, and allowed him to control the dissemination of "scientific" information to the Company's other executives, the members of the Board, and its stockholders.

14.     The facts revealed in the Hindenburg Report sent Enochian shares plummeting by nearly 50%. Following the precipitous stock drop, securities class action lawsuits were filed against Enochian, its directors, and officers, alleging violations of the anti-fraud provisions of the federal securities laws.[10] Similarly, at least two derivative lawsuits were filed in California state and federal courts, each based solely on public information.[11]

15.     As explained further below, the Company's statements about the significance of Gumrukcu's arrest to the Company are not only false and/or misleading, but they are also completely consistent and representative of the Board's apparent approach to governance, which has resulted in the unravelling of a web of lies that a former executive would describe to Hindenburg as "another Elizabeth Holmes story."[12]

16.     ███████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████████[13]

---

[10]  Complaint, *Chow v. Enochian Biosciences Inc.*, No. 22-cv-01374 (C.D. Cal. July 26, 2022); Complaint, *Manici v. Enochian Biosciences Inc.*, No. 22-cv-05237 (C.D. Cal. July 28, 2022).
[11]  Complaint, *Koenig v. Gumrukcu*, No. 22-cv-6871 (C.D. Cal. Sept. 22, 2022); Complaint, *Midler v. Gumrukcu*, No. 22STCV33960 (Cal. Sup. Ct. Oct. 20, 2022).
[12]  Hindenburg Report.
[13]  ██████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████

17.     On October 21, 2022, the Company filed suit against Gumrukcu and his affiliates, attempting to recover the nearly $25 million it had paid them since 2019. Throughout its complaint, the Company repeatedly alleges that it "could not have … discovered the true data from the research performed [by Gumrukcu]," it "reasonably relied on [Gumrukcu's] misrepresentations when deciding to make payments," and "if Enochian had knowledge of the true data, it would have behaved differently."[14]

18.     The Company's lawsuit against Gumrukcu and his affiliates does not seek to remedy any harm that Gumrukcu caused the Company: (i) before the November 15, 2019 Framework Agreement; (ii) as a result of indirect payments made in connection with the Framework Agreement (*e.g.*, purchased lab equipment, employee salaries, CRO payments, or payments to regulatory consultants in connection with related projects), nor does it seek to remedy any of the ongoing harm that Gumrukcu's misconduct continues to cause the Company.

19.     As a result of these shocking revelations, and based on Gumrukcu's lack of any formal academic or practical background in science, it is likely that the remainder of Enochian's pipeline is also flawed. The Company has further become subjected to substantial liability, it will be forced to expend substantial sums to defend itself, its officers, and directors, and the Company has suffered devastating reputational harm.

20.     The material damage caused to Enochian and its stockholders was the result of the Enochian Board's approval of, and/or acquiescence in: (i) the more than $150 million acquisition of worthless licenses for intellectual property from Gumrukcu; (ii) the Company's increasing

---

[14]  The Company's case was filed in the Superior Court of California, County of Los Angeles, under the caption *Enochian Biosciences, Inc. v. Gumrukcu*, No. 22STCV34071 (Cal. Sup. Ct.) (the "Enochian Action").

reliance on Gumrukcu; (iii) the decision to allow Gumrukcu to control the Company's scientific information, processes, and procedures; (iv) the lack of oversight regarding the Company's pipeline; and (v) the payment of nearly $25 million to Gumrukcu and his affiliates under the Framework Agreement.

21.     The current and former members of Enochian's Board ignored numerous red flags that would have helped them prevent Gumrukcu from causing the Company further harm, and issued statements about him and his purported scientific efforts that were false, misleading, and omitted material information.

22.     Had the Individual Defendants acted timely in accordance with their fiduciary duties, the damage caused to Enochian and its shareholders could have been mitigated. As a result of the Defendants' breaches of fiduciary duty, and other misconduct, Enochian has sustained substantial damages and irreparable injury to its reputation. Through this action, Plaintiff seeks to recover for the Company its damages and remediate the corporate governance weaknesses that have caused Enochian's harm.

23.     Plaintiff did not make a demand prior to bringing this action because it would be futile and is thus excused. The Individual Defendants are neither disinterested nor independent. In the absence of this action, Enochian will neither recover its damages nor properly remediate the weaknesses in its internal controls and corporate governance practices and procedures.

## JURISDICTION AND VENUE

24.     Pursuant to 28 U.S.C. § 1331 and section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

25.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Enochian is incorporated in this District.

## THE PARTIES

### A. Plaintiff

26.     Plaintiff John Solak is, and at all times relevant hereto has been, an owner and holder of Enochian common stock.

### B. Nominal Defendant

27.     Nominal Defendant Enochian is a corporation organized and existing under the General Corporation Law of the State of Delaware, with its principal executive offices located at 1927 Paseo Rancho Castilla, Los Angeles, CA 90032. Enochian is a pre-clinical stage biotechnology company that purportedly researches and develops pharmaceutical and biological therapies for the treatment of human immunodeficiency virus ("HIV"), hepatitis B virus ("HBV"), influenza and coronavirus infections, and cancer. Enochian's shares currently trade on the Nasdaq Capital Market under the symbol "ENOB."

### C. Defendants

28.     Defendant Gumrukcu is a co-founder and the controlling shareholder of Enochian, as the leader of the controlling group of shareholders—Gumrukcu (holder of 18.15% shares), his spouse, Anderson Wittekind (holder of 17.33% shares), his employee, Carl Sandler (holder of 6.68% shares), and affiliated entities own about 42.16% of Enochian–the largest single stake in the Company.

29.     Defendant Sindlev is a co-founder of Enochian and the Board Chair since June 2018. He is an investor and entrepreneur since 1997 through several holding companies, including RS Group ApS, RS Arving ApS, RS Family ApS, RS Newton ApS, and RS Bio ApS. In January 2014, he established Dr. Smood ApS in Denmark, and Dr. Smood Group, Inc. in the United States,

a chain of USDA Certified Organic restaurants, and since 2014 he has served as Chair. As of January 24, 2022, Sindlev owned 9,702,808 shares of Enochian common stock, or 18.42% thereof. According to the 2021 Proxy Statement filed by Enochian with the SEC on February 3, 2021 (the "2021 Proxy Statement") and the 2022 Proxy Statement, he received the following compensation:

|  | Fees Earned or Cash Payments | Option Awards | Totals |
|---|---|---|---|
| 2021 | $45,000 | $29,462 | $74,462 |
| 2020 | $45,000 | $31,345 | $76,345 |

30.     Defendant Dybul has been Enochian's Chief Executive Officer ("CEO") and principal executive officer since July 20, 2021, Executive Vice Board Chair since January 2019, and a Director since February 2018. According to the 2021 and 2022 Proxy Statements, he received the following compensation:

|  | Fees Earned or Cash Payments | Option Awards | Totals |
|---|---|---|---|
| 2021 | $430,000 | – | $430,000 |
| 2020 | $430,000 | $832,000 | $1,262,500 |

31.     Defendant Carol Brosgart ("Brosgart") has been a Director of Enochian since December 2019. Brosgart is a member of the Nominating and Corporate Governance Committee. Previously, she served as a board member of Tobira Therapeutics, Inc. ("Tobira"), from September 2009 until November 2016. Brosgart is the Chair of the Scientific Advisory Committee for Hepion Pharmaceuticals, Inc. (formerly ContraVir Pharmaceuticals, Inc. ("ContraVir")), a biotechnology company. As of January 24, 2022, Brosgart owned 41,049 shares of Enochian common stock. According to the 2021 and 2022 Proxy Statements, Brosgart received the following compensation:

|  | Fees Earned or Cash Payments | Option Awards | Totals |
|---|---|---|---|
| 2021 | $69,000 | $49,856 | $118,856 |
| 2020 | $34,500 | $43,297 | $77,797 |

32.     Defendant Gregg Alton ("Alton") has been a Director of Enochian since December 2019. Alton is the Chair of the Nominating and Corporate Governance Committee. As of January 24, 2022, Alton owned 41,049 shares of Enochian common stock. According to the 2021 and 2022 Proxy Statements, Alton received the following compensation:

| | Fees Earned or Cash Payments | Option Awards | Totals |
|---|---|---|---|
| 2021 | $77,500 | $49,856 | $127,356 |
| 2020 | $38,750 | $43,297 | $82,047 |

33.     Defendant James Sapirstein ("Sapirstein") has been a Director of Enochian since March 2018. Sapirstein is the Chair of the Compensation Committee and a member of the Audit Committee. As of January 24, 2022, Sapirstein owned 75,502 shares of Enochian common stock. According to the 2021 and 2022 Proxy Statements, Sapirstein received the following compensation:

| | Fees Earned or Cash Payments | Option Awards | Totals |
|---|---|---|---|
| 2021 | $77,500 | $50,730 | $128,230 |
| 2020 | $80,500 | $43,467 | $123,967 |

34.     Defendant Carl Sandler ("Sandler") is a co-founder of Enochian and was a Director between February 2018 and March 2022. He is a former business partner of Gumrukcu, as one of the two managers of Weird Science, LLC. As of January 24, 2022, Sandler owned 8,480,763 shares of Enochian common stock, or 16.10% thereof. According to the 2021 and 2022 Proxy Statements, Sandler received the following compensation:

| | Fees Earned or Cash Payments | Option Awards | Totals |
|---|---|---|---|
| 2021 | $45,000 | $30,433 | $75,433 |
| 2020 | $45,000 | $42,745 | $87,745 |

35.     Defendant Henrik Grønfeldt-Sørensen ("Grønfeldt-Sørensen") has been a Director of Enochian since October 2017, CEO of RS Group ApS, RS Arving ApS, RS Family ApS and RS

Newton ApS since October of 2012, and a Director of Dr. Smood Group, Inc. since January 2014. As of January 24, 2022, Gronfeldt-Sorensen owned 77,269 shares of Enochian common stock. According to the 2021 and 2022 Proxy Statements, Grønfeldt-Sørensen received the following compensation:

| | Fees Earned or Cash Payments | Option Awards | Totals |
|---|---|---|---|
| 2021 | $45,000 | $29,114 | $74,114 |
| 2020 | $45,000 | $40,021 | $85,020 |

36.     Defendant Jayne McNicol ("McNicol") is an Enochian director and Chair of its Audit Committee since May 2021. According to the 2022 Proxy Statement, McNicol received the following compensation:

| | Fees Earned or Cash Payments | Option Awards | Totals |
|---|---|---|---|
| 2021 | $7,418 | $105,542 | $112,960 |

37.     The defendants identified in paragraphs 35-43 are referred to collectively as the "Individual Defendants."

### THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

38.     By reason of their positions as directors of Enochian and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owe and owed Enochian and its shareholders fiduciary obligations of loyalty, good faith, due care, and candor, and were and are required to use their utmost ability to control, manage, and oversee Enochian in a fair, just, honest, and equitable manner.

39.     The Individual Defendants were and are required to act in furtherance of the best interests of Enochian and its shareholders to benefit all shareholders equally and not in furtherance of their own personal interests or benefit.

40. To discharge their duties, the officers and directors of Enochian were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial and corporate affairs and assets of the Company.

41. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Enochian, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Enochian, each of the Individual Defendants had knowledge of material non-public information regarding the Company. To discharge their duties, the officers and directors of Enochian were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of Enochian were required to, among other things:

(a) Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b) Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable district and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c) Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d)　　When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

42.　　The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Enochian.

43.　　At all times relevant, the Individual Defendants were the agents of each other and Enochian and were always acting within the course and scope of such agency.

44.　　Each of the Individual Defendants breached his or her fiduciary duties as alleged herein, both individually and in concert with the other Defendants.

**A. Additional Duties Under the Code of Ethics and Conduct**

45.　　The Individual Defendants were and are also subject to particularized duties pursuant to specific policies in effect at Enochian.

46.　　The Company maintains a Corporate Code of Ethics and Conduct (the "Code of Ethics"). The Code of Ethics sets forth legal and ethical standards of conduct for directors, officers, employees, and consultants of Enochian and its subsidiaries.

47.　　Under the Code of Ethics, Enochian directors, officers, employees and consults must ensure:

- compliance with all applicable government laws, rules and regulations and to bring lapses or violations to light;

- honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- full, fair, accurate, timely and understandable disclosure in reports and documents that Enochian files with, or submits to, the SEC or any other governmental agency and in other public communications;

- the prompt internal reporting of violations of the Code of Ethics; and

- accountability for adherence to the Code of Ethics.

48.     The Code of Ethics requires directors, officers and employees to promptly provide

information related to public disclosures:

> Depending on their position with the Company, employees, officers or directors may be called upon to provide information to assure that the Company's public reports are complete, fair and understandable. The Company expects all of its personnel to take this responsibility very seriously and to provide prompt and accurate answers to inquiries related to the Company's public disclosure requirements.

49.     The Code of Ethics details the Company's policy against insider trading:

> It is illegal for any person, either personally or on behalf of others, (i) to buy or sell securities while in possession of material nonpublic information…. All directors, officers, employees … must comply with these "insider trading" restrictions.

50.     The Code of Ethics requires that all violations be reported and represents that failure

to do so is a "severe disciplinary matter," that could result in termination:

> Employees officers and directors should promptly report to the Compliance Officer any conduct that the individual believes to be a violation of law or business ethics or of any provision of the Code [of Ethics]. Violations, including failures to report potential violations by others, will be viewed as a severe disciplinary matter that may result in personnel action, including termination of employment.

51.     Finally, the Code of Ethics requires:

> Compliance with the Law. All Employees and Directors are expected to comply with all applicable laws, rules and regulations.

> Compliance and Reporting. Employees and Directors are expected to comply with this Code and its underlying policies and procedures to protect the Company and its Employees and Directors from criticism, litigation or embarrassment that might result from alleged, perceived or real conflicts of interest or unethical practices. Violations of this Code are grounds for disciplinary action up to and including discharge and possible legal prosecution.

**B.  Additional Duties of the Members of the Audit Committee**

52.     The Company's Audit Committee is specifically tasked with oversight responsibilities assessing, among other things, the quality and integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the implementation and effectiveness of the Corporation's ethics and compliance program, and preparation of all reports required to be included in the Company's proxy statements.

53.     Pursuant to the Audit Committee Charter, other duties and responsibilities of the Audit Committee Member include:

- Consider and review with the independent auditors and management the integrity of the Company's financial reporting processes, both internal and external, including the adequacy and effectiveness of the Company's internal controls;

- Discuss with management and the independent auditors the Company's guidelines and policies with respect to risk assessment and risk management and the Company's major financial risk exposures and the overall steps management has taken to monitor and control such exposures;

- Review of the Company's anti-fraud controls, and policies and procedures in place to ensure compliance with the Foreign Corrupt Practices Act; and

- Report regularly to the full Board, including with respect to any issues that arise with respect to the quality or integrity of the Corporation's financial statements and the Corporation's compliance with legal or regulatory requirements.

**C. Additional Duties of the Members of the Nominating and Governance Committee**

54.     The members of the Nominating and Governance Committee have additional duties outlined in the Nominating and Corporate Governance Committee Charter, which include:

- Developing and recommending to the Board the Corporate Governance Guidelines for the Corporation and overseeing compliance with such Guidelines;

- Reviewing and reassessing the adequacy of such Corporate Governance Guidelines and recommending any proposed changes to the Board; and

- Monitoring compliance with the Corporation's Code of Ethics and Conduct, which includes reviewing with counsel the adequacy and effectiveness of the Corporation's procedures to ensure proper compliance with such Code of Conduct and Ethics.

## FACTUAL BACKGROUND

### A. Background

55.    Enochian is a pre-clinical stage biotechnology company engaged in the research and development of pharmaceutical and biological products for the treatment of human immunodeficiency virus ("HIV"), hepatitis B virus ("HBV"), influenza and coronavirus infections, and cancer.

56.    Defendants Gumrukcu and Sindlev began a business partnership in 2016, after they were introduced by a mutual friend.

57.    In April 2017, Gumrukcu founded Gumrukcu Health LLC and within weeks he was hired as a consultant by DanDrit Biotech USA Inc. ("DanDrit"), a drug developer backed by Sindlev.

58.    Gumrukcu then helped form two separate, but related, entities, Seraph Research Institute ("SRI") and Seraph Medical. SRI served as a headquarters for Gumrukcu's purported medical research. The other entity, Seraph Medical, was a treatment center. Together, SRI and Seraph Medical acted as an "incubator" for the founding of Enochian Biopharma Inc., the predecessor to the Company.

59.    By July 2017, DanDrit and Sindlev were engaged in talks for a deal with another of Gumrukcu's companies, Weird Science LLC ("Weird Science"). Dandrit eventually purchased a perpetual license in Weird Science's intellectual property from Gumrukcu, acquired Enochian Biopharma, Inc., and created a new entity, Enochian, which was formed to commercialize Gumrukcu's treatment technologies.

60.     On January 17, 2018, DanDrit announced the acquisition of Enochian Biopharma, Inc. According to Leire, DanDrit's President and CEO, "[t]his acquisition demonstrates our deep commitment to continuing to invest in future innovation in the field of cellular therapy and we believe Enochian's technology will enhance our efforts to improve care for people with HIV and advanced cancers."[15]

61.     In the press release, it was represented that the purchase brought DanDrit a new proprietary technology platform including "combinatory gene therapy methods in the field of HIV/AIDS[, ... which] will enhance DanDrit's research and development efforts in cellular therapy and add to its pipeline, which also includes cellular immune-oncology products for the prevention of relapse of metastatic colon cancer after resection and chemotherapy."[16]

62.     The press release also disclosed that the acquisition was subject to the condition that Enochian execute a perpetual, sole and exclusive license with Gumrukcu's entity, Weird Science:

> Enochian will have executed a perpetual, sole and exclusive license with Weird Science LLC to use all of Weird Science LLC's intellectual property rights in its proprietary technology for the prevention, treatment and amelioration of HIV in humans, including an assignment of the rights to experimental studies with syngeneic and humanized mice models, and DanDrit will be satisfied with all due diligence related to such intellectual property, [and] DanDrit, Weird Science LLC and a certain stockholder of DanDrit will have entered into an Investor Rights Agreement and a Standstill & Lock-Up Agreement….[17]

63.     On February 19, 2018, DanDrit issued a press release announcing completion of the Enochian acquisition and the change of DanDrit's name to Enochian BioSciences Inc., stating:

---

[15]   Press Release, *Dandrit Biotech Announces Acquisition of Enochian*, ENOCHIAN BIOSCIENCES (Jan. 17, 2018), available at https://www.sec.gov/Archives/edgar/data/1527728/000121390018000600/f8k011218ex99-1_dandritbio.htm.

[16]   *Id.*

[17]   *Id.*

"As a result of the Acquisition, DanDrit owns a perpetual, fully paid up, royalty free, sublicensable, exclusive, license to new technology platforms for the treatment of HIV, including combinatory gene therapy models[.]"[18]

64.     On July 2, 2018, Leire wrote in a letter to shareholders that before completing the acquisition of Enochian, "we engaged in due diligence to assess the value of its proprietary technology related to the treatment of HIV."[19] According to Leire, this due diligence included "our internal evaluation of the viability of the technology, an evaluation by intellectual property counsel on the intellectual property rights associated with such technology, and an independent valuation on the technology."[20]

65.     In its 2018 Annual Report on Form 10-K for the fiscal year ended June 30, 2018 (the "2018 10-K"), the Company ascribed the value of $154,824,000 to the License Agreement it obtained from Weird Science through the acquisition of Enochian. This License Agreement was the Company's largest asset.

**B. Enochian's Reliance on Gumrukcu and the Torrent of Red Flags Disregarded by the Board**

66.     On April 14 and 15, 2018, the Board held a special meeting, during which "Dr. Leire and Dr. Gumrukcu gave an extensive presentation on portfolio management, including a detailed discussion of the development and regulatory plan associated with ENO-1001 … and ENO-1002…."[21] Then, "Dr. Leire and Dr. Gumrukcu … provided an update on the Company's

---

[18]   Press Release, *Dandrit Biotech Announces Filing of Listing Application To The Nasdaq Capital Market*, ENOCHIAN BIOSCIENCES (Feb. 23, 2018), available at https://www.sec.gov/Archives/edgar/data/1527728/000121390018002251/f8k021618ex99-1_dandritbio.htm.
[19]   Sindlev and Leire, *Letter to Shareholders*, ENOCHIAN BIOSCIENCES (July 2, 2018), available at https://www.sec.gov/Archives/edgar/data/1527728/000173112218000023/e1109_99-1.htm.
[20]   *Id*.
[21]   ENO220-00356.

oncology pipeline," and "Dr. Gumrukcu continued to offer details regarding his research … [and] described methods including … engineering cells to treat cancer.[22]

67.     At this meeting, the Board also discussed the "intangible assets in IP licensing with Weird Science" that it had acquired through the merger, noting that "it must engage a separate expert for impairment testing in July, 2018," and "approved a budget of Two Hundred Thousand Dollars ($200,000) for Dr. Gumrukcu's laboratory buildout and equipment."[23]

68.     On May 15, 2018, Enochian filed with the SEC a Quarterly Report on Form 10-Q for the period ended March 31, 2018 ("Q1 2018 10-Q") disclosing that, among other things, "[o]n February 16, 2018, the [Company] entered into a consulting agreement with Weird Science under which Weird Science will provide ongoing medical services related to the development of the Company's products for the treatment of HIV and cancer."[24] The Q1 2018 10-Q also attached as exhibits the consulting agreements the Company had executed with Weird Science and Sandler.

69.     ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████ ██ ████████████████████████████████████
████████████████████████████████████████████████████

---

[22] *Id.*
[23] ENO220-00356–00357.
[24] Q1   2018   10-Q,   Enochian   BioSciences   (May   15,   2018),   available   at
https://www.sec.gov/Archives/edgar/data/1527728/000173112218000013/e1079_10q.htm.
[25] ████████████████████

████████████████████████████████████████████

████████████████████████████████

70.     On June 29, 2018, the Board held a special meeting, and Sindlev informed the other Board members that "the Company had arranged for security satisfactory to Dr. Gumrukcu."[27] Later, the Company's former CEO, Leire, "present[ed] a strategic update review of the Company's oncology and HIV projects … stressed the importance of the Company's ability to conduct in-house process development of ENO-1001 … provided a brief summary of the status of the Oncology pipeline, stating that the cornerstone is ENO-5001 … [and] Dr. Leire and Dr. Gumrukcu responded to questions posed by the Board."[28] Gumrukcu and Sindlev also "described groundbreaking revolutionary treatment invented by Dr. Gumrukcu for his patients that could be applied to other treatments or diseases."[29]

71.     On July 18, 2018, the Board held a special meeting "for the purpose of considering the Consulting Agreement … by and among the Company, its wholly owned subsidiary, Enochian Biopharma, Inc. and G Tech Bio LLC…."[30] After the Board was informed that "G Tech Bio LLC is owned by Serhat Gumrukcu and W. Anderson Wittekind," they adopted a resolution approving the Consulting Agreement and delegated all responsibilities related to its execution to Leire.[31]

---

[26] ████████████████████████
[27] ENO220-00360.
[28] ENO220-00361.
[29] ENO220-00362.
[30] ENO220-00364.
[31] *See* ENO220-00365 ("Dr. Eric Leire, as Chief Executive Officer of the Company, or his designee, is hereby authorized and directed to execute and deliver the Agreement on behalf of the Company, with such changes as he shall deem appropriate and to be in the best interests of the Company.").

72.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.["32] Then, "Leire provided a research and development update, stating that the HIV vaccine study is progressing, and that proof of concept costs were being considered … [which] were the result of Dr. Gumrukcu's creativity and the Consulting Agreement."[33]

73.    On October 29 and 30, 2018, the Board held a special meeting, at which Leire and Gumrukcu again presented on the Company's HIV/AIDS (ENO-1001 and ENO-2001) and oncology (ENO-5001) pipelines, "offering details as to manufacturing partners, status, timing and next milestones."[34]

74.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



75.    On December 27, 2018, the Board held a special meeting, at which "the first item on the agenda was consideration of the separation of employment of Eric Leire as CEO, and …

---

[32]  ▮▮▮▮▮▮▮▮▮
[33]  *Id.*
[34]  ENO220-00373.
[35]  ENO220-00458–00459.
[36]  ENO220-00459. Despite being redacted from the minutes, the Company's Quarterly Report specifies the amount of these increases: "During the three and six months ended December 31, 2018, $375,000 and $750,000, respectively, was charged to research and development expenses in our Condensed Consolidated Statements of Operations."

Bob Wolfe, the CFO ….”[37] While the grounds for their termination was not discussed, the Board was “in agreement to terminate Mr. Wolfe and Dr. Leire as soon as possible ….”[38] Thereafter, Dybul, who was part of the discussion regarding the CEO succession plan, was chosen to be the Company’s Executive Vice-Chair of the Board.[39] Dybul abstained from voting on amendments to the Bylaws that granted the Executive Vice-Chair of the Board “all lawful powers necessary to conduct the general and active management of the business of the Corporation ….”[40]

76. ████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████

77. On February 10, 2019, the Board held a special meeting, at which “Dybul provided an update on the activities of the Scientific Advisory Board,” “described the Company’s product strategy,” and then “stated that Management must track budget as well as science for critical path.”[42]

78. On February 11, 2019, the Company held a shareholder meeting in Los Angeles. At the meeting, shareholders were presented with the following slides regarding the Company’s “Technology Pipeline” and “Technology Timeline,” showing Gumrukcu’s critical role in the pipeline products:[43]

---

[37] ENO220-00378.
[38] ENO220-00379.
[39] ENO220-00381.
[40] *Id.*
[41] ████████████
[42] ENO220-00384–00385.
[43] ENO220-00525–00528.



## TECHNOLOGY TIMELINE

### HIV/AIDS

#### HV-01

| | |
|---|---|
| 2012 | Dr. Gümrükçü designed first version of his HIV cure (allo-transplant) |
| 2013 | Dr. Gümrükçü treated and successfully cured his first HIV patient (allo-transplant) |
| 2014-2016 | Dr. Gümrükçü designed the autologous method of the HIV cure |
| 2017 | ██████████████████████████████ |
| 2018 | Dandrit-Enochian Acquisition |
| 2019 | ████████████████████████████ |
| | ██████████████████ |

#### HV-11 and HV-12

| | |
|---|---|
| 2018 | Vaccine technology design |
| 2019 | ████████████████████████ |



## TECHNOLOGY TIMELINE

### ONCOLOGY

#### DB-01

| | |
|---|---|
| 2018 | Enochian Biosciences inherited Dandrit Biotech's MCV vaccine |

#### DC-01

| | |
|---|---|
| 2006-2017 | Dr. Gümrükçü successfully used ███████ therapies for cancer patients |
| 2018 | Dr. Gümrükçü designed a novel genetic modification process to enhance the efficacy of ███████ vaccines |
| | DC-01 was designed with the ██████ technology combined with Dandrit's ██████ to treat late stage colon cancer patients |
| 2019 | Planning to initiate ████████ |

79.   ████████████████████████████████████████████████

████████████████████████████████████████████████ ██ ████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████ ██

---

44  ENO220-00464.

45  ████████████████████

- 24 -

80.     ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

81.     On May 13, 2019, the Board held a special meeting, at which "Dybul began by stating that exciting things are happening with R&D and with the Scientific Advisory Board. He stated that there have not been recent updates and the team is still refining how to provide updates, but this process is ongoing. The scientific team is currently troubleshooting, but he expects the project management tools to assist in this process. … Dybul concluded by stating that the scientific process is on track and answering questions. Dr. Gumrukcu stated that he agreed with Dr. Dybul's description."[47] Later, in connection with discussion about the Scientific Advisory Board, "Dybul concluded that the SAB is deeply engaged, and while it is not an independent board, having a truly independent SAB is a year away."[48]

82.     ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████ ███████████████████████

███████████████████████ ███████████████████████████

████████████████

---

[46]  ████████████████████

[47]  ENO220-00390.

[48]  Id.

[49]  ████████████████████

[50]  ███

[51]  ████████████.

83.     On August 5, 2019, the Board held a special meeting, at which the Company's CFO described the "process used in arriving at the budget and the cash flow forecast," including meeting with Dybul and Gumrukcu "to discuss anticipated expenditures for the next several years using pipeline costs and timing predictions."[52]

84.     On September 10, 2019, the Board held a special meeting, at which Dybul and Gumrukcu "discussed various competitors' products and their probability of success," with Dybul offering his opinion that Gumrukcu's "combined approach is far superior."[53] Later, the Board was informed that Gumrukcu had "formed a 501(c)(3) nonprofit organization, Seraph Research Institute … that could possibly receive a 'block grant' for specific research," and the "Company had requested the preparation of a framework agreement for Dr. Gumrukcu …."[54] "Dybul described Phase I and the Notional Phase of the framework agreement, stating that the Company's commitment would consist of cash contributions to fund the CEO, staff, contracting, reagents and equipment and provide in-kind space and equipment and 10% of staff time. In return, SRI would exclusively license to the Company all intellectual property and data for any potential product discovered by SRI that is intended to be developed and fully funded by the Company. The Company and SRI will have two Board members in common … the Company intends to move forward with the project."[55]

85.     On November 4, 2019, Seeking Alpha published a research report on Enochian, authored by Med Genie (the "Med Genie Report"), which questioned the Company's: (i) "[l]argest asset," the "$155m intangible which is a license to company owned by largest shareholder Weird

---

[52] ENO220-00393.
[53] ENO220-00399.
[54] ENO220-00400.
[55] ENO220-00401.

Science LLC," which "is solely from a patent owned by the Inventor;" (ii) below-average spending on internal research and development, with the bulk of it being done by "entities controlled by Board members or … Board members themselves, … in labs in the same office building … ;" (iii) compensation-related agreements in connection with Board members' ownership of 65% of the Company; and (iv) "blind hope" in connection with a lack of scientific publications by Gumrukcu or Enochian "on the use of autologous stem cells or anything biochemistry-related let alone any scientific data for their treatment."[56] The Med Genie Report concludes that "Weird Science LLC basically got about $150m of value out of thin air assuming current prices for essentially getting a license which I believe is of questionable, unproven value."[57]

86. On November 7, 2019, the Board held a special meeting, at which "Dybul stated that the progress with the Company's multiple pipelines, its scientific timeline for 2020 and its many resource commitments were very exciting and opined that the Company was in a very strong position."[58] Then, "Dybul discussed HV-01 milestones and their projected completion dates … Gumrukcu then provided current details of the study … Dybul stated that the study's outcome far exceeded all previous studies and described the innovative process by which Dr. Gumrukcu and his team achieved the results … then responded to numerous questions from the Board regarding the scientific processes involved, multiple substantiating factors …."[59] Later, "Dybul described HV-11/12 … as possibly the Company's most exciting pipeline and … summarized costs and the

---

[56] Med Genie, *The Curious Case Of Enochian Biosciences: Value Out Of Thin Air - Price Target $1*, SEEKING ALPHA (Nov. 4, 2019), available at https://seekingalpha.com/article/4301597-curious-case-of-enochian-biosciences-value-out-of-thin-air-price-target-1.
[57] *Id.*
[58] ENO220-00403.
[59] ENO220-00405.

timeline for ENOB - DC 11 to 21."[60] Finally, "Dybul summarized the capital expenditures equipment list, stating that the team's point of view is to bring as much work in-house as it can, avoiding risk from external parties … stat[ing] that management must be disciplined and assess essential versus strategic costs."[61] There was no discussion of the Med Genie Report, or any of the allegations asserted therein.

87.  ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████

88.  There was no Board-level discussion of the Med Genie Report, or any of the allegations asserted therein.

89.  On November 19, 2019, Seeking Alpha published a research report on Enochian, authored by White Diamond Research (the "First White Diamond Research Report"), concluding that the Company should be valued at no more than $0.25 per share or $10 million because of questions about Gumrukcu, and noting that Enochian's "lead scientist and inventor, has very little scientific experience and no published scientific papers as far as we know. He considers himself a mystic, performs magic tricks, and was accused of identity theft, grand theft, false impersonation, and plead guilty to commercial burglary in Los Angeles in 2018."[63]

---

[60] *Id.*
[61] ████████████████████████████
[62] ENO220-00478.
[63] White Diamond Research, *Enochian Biosciences Is A House Of Cards - The Pipeline Is*

90.     The First White Diamond Research Report noted that Gumrukcu was not listed as a student at the medical school he claimed to attend and that his claimed medical studies underlying Enochian's drug development were not published in a peer-reviewed journal. Rather, "[h]e considers himself a mystic, performs magic tricks, and was accused of identity theft, grand theft, false impersonation and plead guilty to commercial burglary in Los Angeles in 2018."[64] And, the First White Diamond Research Report noted that Gumrukcu's claim that he was a Nobel Prize nominee was patently incredible because his hypothesis for an HIV cure was only tested on mice.[65]

91.     According to the First White Diamond Research Report, Gumrukcu was arrested in 2017, held on $625,000 bail, charged with grand theft, false impersonation, identity theft, commercial burglary, and more in Los Angeles from 2014 through 2016, pleaded no contest to commercial burglary in January 2018, and was sentenced to five years of probation.[66]

92.     Then, on December 5, 2019, Seeking Alpha published another research report on Enochian, authored by White Diamond Research (the "Second White Diamond Research Report"), which further called into question Gumrukcu's background and the Company's acquisition of a license from Gumrukcu for a treatment designed to treat the Hepatitis B Virus for an undisclosed amount of money.[67] The Second White Diamond Research Report also addressed: (i) the resignation of an Enochian director after one week; (ii) that Gumrukcu was practicing medicine in

---

*Entirely Pre- Clinical And Management Has A Questionable Histor*y, SEEKING ALPHA (Nov. 19, 2019), available at https://seekingalpha.com/article/4307809-enochian-biosciences-is-house-of-cards-pipeline-is-entirely-pre-clinical-and-management.

[64]     *Id.*
[65]     *Id*.
[66]     *Id*.
[67]     White Diamond Research, *The Enochian Biosciences Story Has Just Gotten Even More Bizarre*, SEEKING ALPHA (Dec. 5, 2019), available at https://seekingalpha.com/article/4310714-enochian-biosciences-story-just-gotten-even-bizarre.

California without a licence–even if there was an explanation for his lack of academic credentials; and (iii) that there is no explanation for the Company's valuation of its HIV pipeline intellectual property of $154.8 million.[68] The Second White Diamond Research Report concluded: "We, as well as other investors we know, have tried to contact Enochian with questions and they have not responded. The company's lack of transparency is a red flag."

93.     On December 27, 2019, the Board held a special meeting, at which the Board members considered Alton and Brosgart as new members, with "Sapirstein add[ing] that he personally knows and has served on boards with each candidate, and they have shown great promise as directors."[69]

94.     There was no Board-level discussion of the Med Genie Report, the First White Diamond Research Report, the Second White Diamond Research Report, or any of the allegations asserted therein.

95.     On March 27, 2020, the Board held a special meeting, at which "Dybul then discussed potential projects with respect to COVID-19, stating that Dr. Gumrukcu had designed" a related program, and that "the Company has entered into an agreement with Dr. Gumrukcu concerning the COVID-19 [related program], if funding can be raised for development."[70]

96.     ███████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

---

[68] *Id.*
[69] ███████████████████████████.
[70] ███████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████ ███████████████████

████████████████████████████ █

██ █████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████."[73]

Then, "Dybul stated that the Company was moving forward with a number of products related to Covid-19 … Gumrukcu received delivery of his first vector during the prior week and expected another during the upcoming week. He stated that once Dr. Gumrukcu has the vectors and is able to ensure their efficacy, they would be transferred to Scripps and the mice would be injected. Dr. Dybul discussed possible partners and production facilities such as IAVI."[74] Gumrukcu gave a presentation to the Board on the Company's r&d operations and pipeline.[75] "Dr. Dybul stated that Dr. Brosgart had suggested that a separate Scientific Advisory Board be created for Hepatitis B. The Committee will be chaired by Dr. Brosgart and will include Dr. Dybul, Dr. Hardy, and Dr. Gumrukcu, together with several independent members."[76] Later, "Dybul discussed Dr. Gumrukcu's membership on several prominent committees. He stated that on May 12, 2020, the Company would give three scientific presentations at the Annual Meeting of the American Society

---

[71] ████████████████████

[72] █████████████████.

[73] ENO220-00413.

[74] ENO220-00414.

[75] ENO220-00844–00858.

[76] ENO220-00414.

of Gene and Cell Therapy. Dr. Dybul stated that if the [program] is successful, the results would possibly by published in science and nature journals."[77]

98.    On May 9, 2020, a Danish publication named DR Viden raised more red flags regarding Gumrukcu (the "DR Viden Article"), reporting that several Danish doctors with knowledge of Gumrukcu's clinic stated that there was no scientific evidence supporting the conclusion that the treatments Gumrukcu was offering actually worked and, furthermore, Gumrukcu was not permitted to treat patients in his clinic because he was not a licensed physician.[78] Moreover, the DR Viden Article reported that the family of at least one person that Gumrukcu treated was suing him after Gumrukcu's treatments of leeches, mistletoe extract, and so-called nck treatment, which is a form of immunotherapy against cancer, ended in the patient's death. And, the DR Viden Article reported that numerous Danish doctors said that patients should not be treated by Gumrukcu at his clinic.[79]

99.    ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████

100.    On July 16, 2020, the Nominating and Corporate Governance Committee held a special meeting, at which it was "recommended that the Committee should evaluate the size and

---

[77]    ENO220-00415.

[78]    Jeppe Kyhne Knudsen, *Treated children with cancer from Denmark: Controversial doctor in the USA collaborates with Danish business people*, DR VIDEN (May 9, 2020), available at https://www-dr-dk.translate.goog/nyheder/viden/kroppen/behandlede-kraeftsyge-boern-fra-danmark-kontroversiel-laege-i-usa-samarbejder?_x_tr_sl=da&_x_tr_tl=en&_x_tr_hl=en&_x_tr_pto=sc.

[79]    *Id*.

[80]    ████████████████

composition of the Board … consider adding more independent Directors, and … in the future, institutional investors would methodically scrutinize the Board's makeup."[81]

101.     On September 14, 2020, the Board held a special meeting, at which they conducted a "year end review and an overview of the Company's planned activities for 2020-2021."[82] Dybul and Gumrukcu presented on the Company's pipeline, and "Dybul stated that the Company began with one pipeline and expanded within HIV, Hepatitis B and oncology treatments and cures. He stated that many biotech companies have one mechanism of action; by contrast, the Company has multiple mechanisms which can be combined … [and] build[ing] a diverse pipeline across and within diseases allows for better business decisions to sell, sub-license, partner or manufacture and maximize patient impact and stockholder value. He stated that the multiple mechanisms and resultant business opportunities presents a unique characteristic which resonates well with investors … present[ing] a chart of key accomplishments to date …."[83] Dybul then discussed ENOB-HV-01, ENOB-HY-11/12, ENOB-HV-31/32, ENOB-HB-01, presenting milestones, timelines, costs, and cost breakdowns for each project.[84] Then, "Dybul summarized recent press releases, upcoming scientific presentations and relevant scientific publications," before he and Gumrukcu provided an update on the "treatment and vaccine work for SARS-CoV-2," including "a competitive assessment" that would follow Gumrukcu's "scheduled … lecture to ASGCT COVID on September 15, 2020."[85] Dybul also noted that "the Company was seeking a … staff scientist for virology to assume and expand HIV and HBV portfolios."[86]

---

[81] ENO220-00498.
[82] ENO220-00417
[83] ENO220-00419.
[84] ENO220-00419–00420.
[85] ENO220-00421.
[86] *Id.*

102. A presentation from the September 14, 2020 special meeting of the Board provides the Company's "Key Accomplishments To Date," including the: (i) November 2018 filing of a patent for ENOB-HV-01; (ii) June 2019 filing of a provisional patent for ENOB-HV-11/12; (iii) December 2019 presentation of "Hep B results … at HEP DART Conf; Selected as one of best innovations in treatment"; (iv) January 2020 acquisition of "HBV technology"; (v) May 2020 "ENOB-HV-01 … presentations at Annual Conference of the American Society of Gene and Cell Therapy"; (vi) May 2020 presentation of "Hep B results … at Annual Conference of the American Society of Gene and Cell Therapy"; and (vii) July 2020 "Formation of HBV Scientific Advisory Board" (later described as having been "appointed 8/2020").[87] Four (4) of these seven (7) "Key Accomplishments" would end up being fraudulent and the subject of the Company's lawsuit against Gumrukcu.

103. Still, there was no Board-level discussion of the Med Genie Report, the First White Diamond Research Report, the Second White Diamond Research Report, the DR Viden Article, or any of the allegations asserted therein.

104. On September 15, 2020, the Nominating and Corporate Governance Committee held a special meeting, at which the members discussed completing self-assessments, and "Alton stated that although he would prefer that the self-evaluations be completed prior to the proxy filing, the completion of the D&O Questionnaires, some of which remained outstanding, took precedence."[88]

---

[87] ENO220-00613; ENO220-00619.
[88] ENO220-00501. Despite having been requested in Plaintiff's Section 220 Demand, the Company produced no D&O Questionnaires or assessments.

105.    On October 7, 2020, the Nominating and Corporate Governance Committee held a special meeting, at which it was noted that "the Board's self-evaluations had been postponed until after the completion of the D&O Questionnaires pertaining to the filing of the Form 10-K/A," which would be "circulat[ed] … to the Board for completion shortly."[89]

106.    On November 6, 2020, the Board held a special meeting, at which Dybul and Gumrukcu presented on the pipeline, focusing on the "Project Timeline & Costs."[90] "Gumrukcu stated that the [Hepatitis B] team was on schedule," and Gumrukcu and Dybul discussed the Company's COVID-19 program, with Dybul "credit[ing] Dr. Hardy and Mr. Howell with significant contributions to the team."[91]

107.    ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████

108.    On February 17, 2021, the Board held a special meeting, at which "Dybul … stated that the Company's pipelines are progressing impressively and conveyed his excitement for the Company's scientific timeline for 2021."[93] "Dybul reported that the … preliminary data relating to ENOB-HV-01 is very promising … described ENOB-DC-11 and the Company's oncology platform … described the Company's plan to apply its approach to Hepatitis B to address HIV,"

---

[89]  ENO220-00502–00503.
[90]  ENO220-00922.
[91]  ENO220-00427.
[92]  ████████████.
[93]  ENO220-00433.

and "invited Dr. Gumrukcu to present the Company's progress on its ENOB-HBV-01 and COVID-19 pipelines."[94] "Dr. Gumrukcu then answered general questions from the Directors. Dr. Gumrukcu concluded his discussion of ENOB-HBV-01 by praising the competence and contributions of the members of the Scientific Advisory Board, which helped make ENOB-HBV-01 the Company's fastest moving pipeline."[95] Gumrukcu also "fielded questions from the Directors" about the Company's COVID-19 program, "Dybul … stated that the Company's progress is extraordinary if one considers that the Company's lab did not exist three years ago," and "Sindlev concluded the pipeline discussion by commending Dr. Gumrukcu's intelligence, creativity, and foresight."[96]

109.    At the same meeting, "Dybul explained that management believes pipelines can be advanced at a faster rate through the SAB and collaboration with outside consultants," and "a combined approach that uses internal and external laboratories results will produce more expedient validation of findings." Then, "[t]he SAB Chair, Dr. Hardy, reiterated the great contributions of [Gumrukcu] that were discussed earlier in the Board Meeting."[97] The Company's CFO, Luisa Puche ("Puche"), stated in her finance update that "cash and prepaid expenses" accounted for "the two largest fluctuations in this period," and "were … due to activity on patents Dr. Gumrukcu worked on."[98]

110.    ███████████████████████████████████████████

███████████████████████████████████████████

---

[94]    ENO220-00433–00434.
[95]    ENO220-00434.
[96]    ENO220-00435.
[97]    ENO220-00436.
[98]    *Id*.



111.     On May 25, 2021, the Board held a special meeting, during which McNicol was recommended for, and approved to fill a seat on the Board and on the Audit Committee.[99] Later, Dybul and Gumrukcu gave a presentation on the Company's "Science and Business Pipeline," discussing "the Covid-19 treatment/prophylaxis."[100] "Dybul stated that because the Company is pursuing a number of pipelines and portfolios, Management is shifting its method of discussing its projects to do so in terms of platforms. He stated that technology platforms have great benefits, maximizing efficiencies so that clinically, the same platform can be used with different delivery mechanisms. He discussed the advantages of the platforms, stating that they have the potential to accelerate and maximize efficiencies/costs in pre-clinical, clinical, regulatory, product

[99]   ENO220-00439.
[100]  ENO220-00440; ENO220-00517.

development, production, distribution, marketing and reimbursement. ████████████

████████████████████████████████████ ██ ████████████████████████

████████████████████████████████████



112. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[101] ████████████████████████████

[102] ██████████.

[103] ENO220-01122.

scheduled for November, 2021."[104] "Dr. Chen then reviewed unique features of Dr. Gumrukcu's approach," and "responded to questions posed by the directors."[105]

113.    On July 19, 2021, the Scientific Advisory Board held a meeting, at which Gumrukcu and Dybul presented the Company's recent HBV chimeric mouse study to members, including Brosgart as Chairperson.[106]

114.    On October 26, 2021, the Board held a special meeting, at which Dybul introduced Company employees Tung Nguyen, Director of Molecular Biology, and Dr. Lu Chen, Director of Product Development and CMC, who he said "had been integral in the Company's submission of [HBV-01 and COVID-19 FDA packages, and Pre-INDs] and that their work had been exemplary."[107] "Dybul remarked on key accomplishments during the period including the completion of Pre-IND packages for ENOB-HB-01 and ENOB-HV-21 and the development of CMC plans, and the acquisition of the Coronavirus and influenza virus license."[108] ███████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████[109] Dybul informed the Board that "although ENOB-HB-01 single dose was 95-98% effective, it was not curative … and the Pre-IND would be resubmitted," and that "the ENOB-CV-01 Pre-IND package was deemed insufficient and would be resubmitted."[110] Dybul further

[104]  ENO220-00441.
[105]  ENO220-00442.
[106]  ENO220-01216.
[107]  ENO220-00446; ENO220-01170–01171.
[108]  ENO220-00446.
[109]  ██████████.
[110]  *Id.*

informed the Board that "SRI was considering a move to another building and that he was considering moving the Company's offices to the same location."[111] ██████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████

115.     At the October 26, 2021 special meeting of the Board, Gumrukcu presented on the Company's "Science and Business Pipeline," and he was included in an organizational chart that showed him as equal to Dybul:[113]



116.     On December 16, 2021, the Board held a special meeting, at which Puche noted that "a formal budget had not been prepared," with decreases in cash and an increase in the accumulative deficit being primarily driven by the HBV license agreement, related CRO costs, and regulatory consulting fees.[114] "Dybul reported that "he had participated in calls … regarding

---

[111] *Id.*
[112] ████████████.
[113] ENO220-01157, ENO220-01175.
[114] ENO220-00451; ENO220-00588, ENO220-00592, ENO220-00595.

the coronavirus," and "that the Omicron variant drove … interest in collaborating with the Company."[115]

117.    On February 21, 2022, the Board held a special meeting, at which Dybul provided an overview of the Company's "Key Accomplishments," before he and Gumrukcu "presented timelines for CV-01, HB-01 and HB-21," and "[d]iscussion followed."[116] Dybul also discussed financing, stating that the "Company had been selected by NCATS/NIH through Antivirals for Pandemics Program."[117]

118.    At the February 21, 2022 special meeting of the Board, Gumrukcu was again included in an organizational chart that showed him as equal to Dybul:[118]



119.    On May 18, 2022, days before his arrest, Gumrukcu sold 253,943 shares of Enochian stock for more than $2 million to Enochian's Chairman of the Board, Sindlev, for $8 per share on a day when the Company's stock price never exceeded $6.26 per share. Gumrukcu possessed material, adverse information that he knew had not been publicly disclosed.

---

[115] ENO220-00451.
[116] ENO220-00880.
[117] ENO220-00879.
[118] ENO220-01023.

120.     On May 25, 2022, Federal prosecutors announced the arrest and indictment of Gumrukcu as one of two men charged in a murder-for-hire conspiracy resulting in the death of Vermont resident Gregory Davis.[119] According to a press release from the U.S. Attorney for the District of Vermont:[120]

> The Office of the United States Attorney for the District of Vermont stated that Serhat Gumrukcu, 39, of Los Angeles, California . . . [was] arrested yesterday after having been charged by a federal grand jury in Vermont with conspiring to use interstate commerce facilities in the commission of murder-for-hire which resulted in the death of Gregory Davis, a resident of Danville, Vermont.

121.     The same day, in connection with its disclosure of Gumrukcu's arrest for murder, the Company claimed that he "has had no formal role in the Company" and that the incident was "completely unrelated to the Company."[121] Clearly, the organizational chart from the Board's February 21, 2022 meeting shows the baseless nature of this statement–Gumrukcu was equal to Dybul in Enochian's chain of command. Following news of Gumrukcu's arrest, Enochian's stock price plunged 37%, declining $2.17 per share, to close at $3.70 per share.

122.     The Defendants' lies about Gumrukcu and his scientific "genius" really began to unravel on June 1, 2022, when the Hindenburg Report was published.[122]

---

[119] *See U.S. v. Serhat Gumrukcu*, No. 5:22-cr-00058 (D. Vt.).

[120] Press Release, *Two Men Charged in Murder-for-Hire Conspiracy Resulting in Death*, DEPARTMENT OF JUSTICE (May 25, 2022), available at https://www.justice.gov/usao-vt/pr/two-men-charged-murder-hire-conspiracy-resulting-death.

[121] Enochian, *Enochian BioSciences Board Learns of Arrest of Co-Founder and Inventor and Expresses Strong Confidence in the Promising Future of the Company*, GLOBALNEWSWIRE (May 25, 2022), available at https://www.globenewswire.com/en/news-release/2022/05/25/2450771/0/en/Enochian-BioSciences-Board-Learns-of-Arrest-of-Co-Founder-and-Inventor-and-Expresses-Strong-Confidence-in-the-Promising-Future-of-the-Company.html.

[122] *Miracle Cures and Murder For Hire: How A Spoon-Bending Turkish Magician Built A $600 Million Nasdaq-Listed Scam Based On A Lifetime Of Lies*, HINDENBURG RESEARCH (June 1, 2022) (the "Hindenburg Report").

123. The Hindenburg Report revealed that Gumrukcu: (i) was never a licensed medical doctor (and did not hold any other type of doctoral degree)–rather, he had purchased a fake Russian medical degree on the black market and, in 2012, he was arrested in Turkey "based on accusations of falsely posing as a doctor"; (ii) had a record of engaging in fraudulent financial transactions–in February 2017, he was arrested after the State of California accused him of 14 felonies, including fraud, identity theft, and check kiting; (iii) was recently arrested on charges of conspiracy to commit murder of a former business partner in an oil deal who accused Gumrukcu of fraud–to prevent him from harming the deal that created Enochian in its current form by disclosing that fraud; and (iv) implicated Enochian's officers and members of its board of directors ("Board") in his criminal dealings–yet, neither his prior fraud nor his criminal past was disclosed to the Company's stockholders.[123]

124. More specifically, the Hindenburg Report first reveals that Gumrukcu's known criminal activities began in August 2012, in his native Turkey, when he was arrested for falsely posing as a doctor, and charging a desperate family $275,000 to treat a terminally ill cancer patient, who subsequently died. Today, Gumrukcu still faces criminal charges from his August 2012 arrest.

125. Next, the Report details Gumrukcu fleeing Turkey in response to his arrest warrant, before selling similar "miracle" concoctions to the desperate parents of a young Pennsylvania boy who had terminal cancer, in August 2015, which resulted in litigation. The Report also details Gumrukcu's February 2017 arrest in the State of California for a total of 14 felonies, including fraud, identity theft, and check kiting.

---

[123] *Id.*

126.     In April 2017, just two months after his arrest for the alleged California crime spree, Sindlev's DanDrit (*i.e.*, Enochian's January 2018 acquiror) hired Gumrukcu as a consultant.

127.     The authors of the Report learned from California authorities that in January 2018, Gumrukcu paid over $1 million in restitution to victims to reduce his felony plea charge to a misdemeanour. Around the same time, Gumrukcu was scheduled to appear in court to defend himself against felony fraud allegations related to a 2016 deal with his business partner, Gregory Davis. However, just 19 days before Gumrukcu's scheduled appearance, on January 6, 2018, Davis was murdered. Federal prosecutors assert that the prospective merger deal through which Enochian became a public company was the motive for the murder scheme.

128.     Despite knowledge of Gumrukcu's ongoing criminal charges, DanDrit, Sindlev, and the Company's Board moved forward with licensing technology that Gumrukcu had developed, acquiring an interest in his related entities, granting Gumrukcu and his affiliates 50% ownership in the combined company, Enochian, and taking the Company public. As he awaited sentencing after pleading guilty, Gumrukcu attended the NASDAQ bell ringing ceremony for Enochian and was introduced as Enochian's "scientific founder."

129.     Indeed, Dybul and Brosgart would go on to write character references for Gumrukcu that were sent to the Istanbul High Criminal Court in September 2020–it is implausible that these letters would have been written without knowledge of their purpose.

130.     And, the Report reveals that Enochian's former CEO, Leire, raised red flags about Gumrukcu, asking "critical questions" about "serious financial improprieties" and large payments to Gumrukcu, and questioning the Company's close association with an individual accused of numerous felonies. However, rather than cut ties with Gumrukcu–or investigate him–the Individual Defendants terminated Leire.

131.    In connection with his lack of qualifications and licensing, the Hindenburg Report revealed that the qualifications the Company had attributed to Gumrukcu were false: "We have been unable to find any jurisdiction in which Gumrukcu is licensed as a medical doctor. He is unlicensed in California, where he has apparently been practicing medicine anyway, and where he has claimed to have made his major breakthroughs for Enochian." The Report also determined that Gumrukcu has no medical degree and no Ph.D., his name does not appear in the official Russian national degree database, he was never enrolled in the Russian school he claims to have graduated from, as verified from correspondence with the institution, and Russian border control and police have no record of Gumrukcu ever having a Russian student visa or even a short-term tourist visa, let alone spending years there studying medicine. Instead, Gumrukcu is reported to have purchased a fake Russian medical degree on the black market–the Reports authors had no difficulty purchasing a phony Russian medical degree from the same school, bearing the same claimed major, date and "official" stamp as Gumrukcu. Similarly, the Turkish university where Gumrukcu claims to have received a Ph.D. has no record of him ever having attended the school. And, Turkish criminal records show that Gumrukcu admitted to police that his highest level of education was a high school degree, despite the arrest taking place after the period in which he claimed to have been a doctor.

132.    The Hindenburg Report declares that based "on our investigation, we strongly believe that Gumrukcu's education credentials are entirely fabricated. Consequently, we believe Enochian's claimed scientific breakthroughs have been developed by a fake doctor with a long criminal rap sheet who now stands accused of murder." Gumrukcu is a "a lifelong con artist, who has catapulted himself from being a small-town Turkish magician to leading a publicly traded, Nasdaq-listed medical research enterprise and fooling many along the way."

133.    And, according to the Report, despite the Company's claims that top scientists back Gumrukcu's research, "many are already backing away." An international cancer doctor that Gumrukcu claimed was his mentor said a picture of him on the website for Gumrukcu's research entity, [SRI], is a fake: "I never wore [a] Seraph coat as shown in the picture, so how could I validate his science?" A microbiologist who served on Enochian's Scientific Advisory Board and was previously quoted by Enochian as saying he was "blown away" by Gumrukcu's "brilliant creativity" stated: "I agree retrospectively I should have done some due-diligence." On the validity of the science, he wrote: "I have never validated anything, and they should not use my name." A former Enochian senior executive explained that he left the Company "because I lost scientific trust in what [Gumrukcu] was promoting…. I had a few facts that corroborated that he lied to me and when scientists start to lie a little bit and massage the data, then I am afraid to have another Elizabeth Holmes story."

134.    The Hindenburg Report closes with a dismal forecast for the Company: "With its founder and main source of scientific discoveries jailed on murder-for-hire allegations, this cash-burning company without peer-reviewed research and no genuine clinical prospects is now a 'catch me if you can' story that we believe has finally reached the end-phase."

135.    The same day that the Hindenburg Report was published, on June 1, 2022, the Company's CEO, Dybul, issued a letter to investors that suggested the Hindenburg Report "attempt[s] to conflate the inventor's past with our future as a company – despite the fact that the inventor has never held a formal role with the company; despite the fact that our company had no knowledge of certain legal issues in which the inventor was involved in foreign jurisdictions; and

despite the fact that the inventor's scientific advisory role with Enochian was terminated as soon as the company learned about these allegations last week."[124]

136. The Company would later issue substantially similar shareholder letters, attached as exhibits to Form 8-Ks and filed with the SEC on June 6, 2022,[125] and September 23, 2022.[126]

137. On June 21, 2022, the Board held a special meeting, at which there was no discussion whatsoever of Gumrukcu, despite the meeting being the first since the public disclosure that he had been arrested for murder on May 25, 2022.[127] In fact, the only difference from prior meetings was that Francois Binette and Greg Duczynski updated the Board on the Company's pipeline, rather than Dybul and Gumrukcu.[128]

138. On June 28, 2022, the Wall Street Journal reported more details about Gumrukcu's fraudulent actions, criminal history, and the motivation behind Gumrukcu's alleged conspiracy to murder Gregory Davis (the "Wall Street Journal Article").[129] The Wall Street Journal Article explained that Gumrukcu arranged the murder to prevent Davis from exposing him as a fraud, a revelation which would have endangered the lucrative deal giving him a significant ownership stake in Enochian. The Wall Street Journal Article further reported that Enochian "paid more than $21 million to companies controlled by [] Gumrukcu and his husband for consulting, research and

---

[124] Dybul, *CEO's Letter to Shareholders*, ENOCHIAN BIOSCIENCES (June 1, 2022), available at https://docs.publicnow.com/viewDoc?hash_primary=D10F71C6EED06B63AD37085214BB845 7023BFEFE (last accessed June 2, 2022).
[125] Dybul, *CEO's Letter to Shareholders*, ENOCHIAN BIOSCIENCES (June 6, 2022), available at https://www.sec.gov/Archives/edgar/data/1527728/000173112222001035/e3817_8-k.htm.
[126] Dybul, *CEO's Letter to Shareholders*, ENOCHIAN BIOSCIENCES (Sept. 23, 2022), available at https://www.sec.gov/Archives/edgar/data/1527728/000173112222001636/e4095_8-k.htm.
[127] ENO220-01047.
[128] ENO220-01049, ENO220-01052.
[129] Joseph Walker, *Past Catches Up To Biotech Wizard Charged in Murder*, WALL STREET JOURNAL (June 27, 2022), available at https://www.wsj.com/articles/biotech-wizard-left-a-trail-of-fraudprosecutors-allege-it-ended-in-murder-11656339183.

the licensing of potential drugs to treat influenza, hepatitis B, HIV and Covid-19," and Sindlev attempted to back up Gumrukcu's credentials to The Wall Street Journal, stating that he believes that Gumrukcu holds a medical degree though he had not "personally checked it," and claiming that he was "in the process of doing so."

139.   Regarding the Davis murder, the Wall Street Journal Article reported that shortly after Davis's body was recovered, his wife, Melissa Davis, told police detectives and the FBI that Davis had mentioned that he was involved in an oil deal involving Gumrukcu and his brother and that he no longer trusted them. Davis believed they owed him more than $900,000 for late fees and penalties. Davis had arranged to broker a deal to buy refined oil products and resell them at a profit in a deal valued between $20 million and $30 million, said a person familiar with the matter. The Gumrukcu brothers agreed to put up the cash in exchange for a percentage of the profit, providing bank documentation that Davis later discovered to be fraudulent. Davis threatened to expose the fraudulent bank documentation provided by Gumrukcu and his brother to the FBI, according to a court filing by prosecutors. Federal prosecutors alleged that Gumrukcu sought to prevent Davis from exposing his fraudulent conduct in their dealings, which would jeopardize the lucrative merger with Enochian Biopharma that resulted in the formation of Enochian, which was undergoing due diligence at the time.

140.   On July 1, 2022, Enochian's CEO issued a shareholder letter announcing findings from an internal review of the scientific data backing its product pipeline. That press release stated, in relevant part:

> In recent days, Enochian … has conducted a rigorous internal review of scientific data to give partners and investors a clear understanding of the Company's pipelines…. [D]uring the review, the Company discovered that former scientific advisor Serhat Gumrukçu altered two different sets of animal data generated by third-party research institutions before Enochian's scientists had a chance to review. One data set was for an inhaled COVID-19 treatment study while

the other was for an HBV therapy study. As a result, the Company will initiate legal action against Gumrukçu over the falsified data. While the investigation verified the source and scientific foundation of the HIV and cancer pipelines, and certain data from the COVID-19 and HBV pipelines, the Company is extremely concerned and disappointed to learn that non-clinical data for those two pipelines were altered. The Company is evaluating its internal controls regarding the review and verification of external scientific data and will modify as appropriate.[130]

141.    Then, on August 29, 2022, the Board held a special meeting, at which "Dybul provided an update regarding the Company's response to the SEC and pending legal matters," "announced that the Company was now working with K&L Gates LLP on Intellectual Property matters," and he "stated that the HV-01 technology had been sublicensed …."[131] Notwithstanding that the Board had recently disclosed its "discover[y] that former scientific advisor Serhat Gumrukçu altered two different sets of animal data generated by third-party research institutions before Enochian's scientists had a chance to review," there was no discussion of the implications that "discover[y]" would have on the Company's pipeline.[132]

142.    Astonishingly, there was still no discussion of the Med Genie Report, the First White Diamond Research Report, the Second White Diamond Research Report, the DR Viden Article, the Hindenburg Report, the Wall Street Journal Article or any of the allegations asserted therein. Indeed, no document from the Company's Section 220 production shows that the Board ever discussed, investigated, or considered those allegations before July 1, 2022.

143.    ███████████████████████████████████████

████████████████████████████████████████████████

---

[130] Enochian, *Enochian BioSciences Announces Findings From A Rigorous Internal Review of Scientific Data*, GLOBALNEWSWIRE (July 1, 2022), available at https://investors.enochianbio.com/news/news-details/2022/Enochian-BioSciences-Announces-Findings-From-A-Rigorous-Internal-Review-of-Scientific-Data/default.aspx.

[131] ENO220-00882.

[132] *Id.*

████████████████████████████████████████████████████

████████ ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████

144.     On October 18, 2022, the Board held a special meeting, at which the Board discussed the completion of "all program source material (data) review," "[r]estructure[d] pipelines," and "[r]ight sizing of staff to align with new pipeline priorities."[135] For "Key Challenges" related to "[p]ipeline development," the Board was notified that "[s]ummer events have resulted in delays in almost all pipeline development," including the "[d]isruption of laboratory operations because of back-to-back relocations … [d]isruption in personnel and turnover because of perceived instability[, and] [d]isruption in execution because of focus on … workstreams."[136] Again, there was no mention of Gumrukcu's arrest, the "discover[y]" that he had falsified data, or the implications that "discover[y]" would have on the Company's pipeline.[137] At

████████████████████████████████████████████████████

████████████████████████████████████████████

---

[133] ENO220-00825.
[134] ENO220-01201.
[135] ENO220-01079.
[136] ENO220-01082.
[137] ENO220-01075–01114.
[138] ████████████████.



145.    For a pre-clinical stage biotechnology company, research with rigorous adherence to the scientific process and strict data integrity standards is essential and mission-critical. Yet, the Board at Enochian failed to exercise oversight of the most fundamental components of the business, and ignored this obligation.

146.    According to the Company, all officers and directors are abdicated of responsibility because they "could not have … discovered the true data from the research performed [by Gumrukcu]," they "reasonably relied on [Gumrukcu's] misrepresentations when deciding to make payments," and "if Enochian had knowledge of the true data, [they] would have behaved differently."[139]

147.    In connection with the Individual Defendants' oversight obligations, this argument is equivalent to something like "the dog ate my homework."

148.    Notwithstanding the importance of accuracy in preclinical research and data to the entire Company's existence, the Company and its Board relied on Gumrukcu for all mission critical

_____

[139] Enochian Action Complaint ¶¶ 209, 211, 219, 221.

aspects of its business, including the: (i) invention of the technology underlying every product in Enochian's pipeline; (ii) performance of research and development regarding those products; and (iii) reporting of results from that research and development to the Company's executives, its Scientific Advisory Board, and the members of the Board.

149.     However, even without any internal reporting systems and an entirely flawed process, the Individual Defendants were presented with ample warning that Gumrukcu was a criminal, with fraudulent credentials, and that his scientific methods were suspect, but they refused to discuss, investigate, or consider every indication of misconduct–deciding instead to take no action.

## C. Enochian's False and/or Misleading Financial Statements

150.     On May 15, 2018, Enochian filed with the SEC the Q1 2018 10-Q stating that then-CEO, Leire, and then-CFO, Wolfe, determined the Company's disclosure controls and procedures were not effective due to deficiencies related to inadequate resources to address complex accounting issues.[140] The Q1 2018 10-Q disclosed that despite hiring "consultants with expertise in U.S. GAAP and SEC financial reporting standards to review and compile all financial information," the Company still expected "to be deficient in our internal controls over disclosure and procedures until sufficient capital is available to hire the appropriate internal accounting staff and individuals with requisite GAAP and SEC financial reporting knowledge."[141]

151.     On October 1, 2018, Enochian filed with the SEC its 2018 10-K.[142] The 2018 10-K was signed by then-CEO Leire, then-CFO Wolfe, Defendants Sindlev, Grønfeldt-Sørensen,

---

[140] Q1 2018 10-Q, ENOCHIAN BIOSCIENCES (May 15, 2018), available at https://www.sec.gov/Archives/edgar/data/1527728/000173112218000013/e1079_10q.htm.
[141] *Id*.
[142] 2018 Form 10-K, ENOCHIAN BIOSCIENCES (Oct. 1, 2018), available at https://www.sec.gov/Archives/edgar/data/1527728/000173112218000094/e1146_form10k.htm.

Sandler, Dybul, Sapirstein, and former Board member Evelyn D'an. Leire and Wolfe certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), that the 10-K fully complied with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the 3Q21 10-Q fairly presented, in all material respects, the financial condition and results of operations of the Company.[143]

152.    The 2018 10-K disclosed that on July 9, 2018, the Company had entered into a consulting agreement with G-Tech Bio, LLC ("G-Tech"), a company controlled by Gumrukcu, to assist the Company with the "development of the gene therapy and autologous and allogenic cell therapy modalities for the prevention, treatment, amelioration of HIV in humans, and with the development of a genetically enhanced Allogenic Dendritic Cell for use as a wide spectrum platform for various diseases (including but not limited to cancers and infectious diseases)."[144] The 2018 10-K further disclosed that "G-Tech is entitled to consulting fees for 20 months, with a monthly consulting fee of not greater than $130,000 per month," and is controlled by "certain members of Weird Science."[145]

153.    In its 2018 10-K, as of August 2018, the Company's pipeline was reported as including the following products:[146]

---

[143] *Id.*
[144] *Id.*
[145] *Id.*
[146] *Id.*

| Program | Indication | Discovery | Preclinical | IND | Phase 1 | Phase 2 | Phase 3 |
|---------|-----------|-----------|-------------|-----|---------|---------|---------|
| ENO-1001 | HIV (AGTHERA™) | ████████████████ | | | | | |
| ENO-2001 | HIV Preventative Vaccine | ██████ | | | | | |
| ENO-3001 | Colon Cancer | █████ | | | | | |
| ENO-4002 | Second generation MCV Colon Cancer | ██████ | | | | | |
| ENO-5001 | Genetically Modified Allo-DC | ██████ | | | | | |
| ENO-4001 | Colon Cancer (MCV) | ████████████████████████████████████ | | | | | Seeking Partnership |

154. On November 14, 2018, the Company filed with the SEC a Quarterly Report on Form 10-Q for the period ended September 30, 2018.[147] In the 10-Q, the Company disclosed that CEO Leire and CFO Wolfe determined that the Company's disclosure controls and procedures remained ineffective due to ongoing material weaknesses in controls over financial reporting.[148]

155. On February 13, 2019, the Company filed with the SEC a Quarterly Report on Form 10-Q for the period ended December 31, 2018, which disclosed that material weaknesses in its internal controls persisted.[149]

156. On May 16, 2019, the Company filed with the SEC a notification of its inability to timely file its Quarterly Report on Form NT 10-Q "because it was not able to finalize its unaudited

---

[147] Form 10-Q, ENOCHIAN BIOSCIENCES (Nov. 14, 2018), available at https://www.sec.gov/Archives/edgar/data/1527700/000173112218000163/e1193_form10q.htm.
[148] Id.
[149] Form 10-Q, ENOCHIAN BIOSCIENCES (Feb. 13, 2019), available at https://www.sec.gov/Archives/edgar/data/1527700/000173112219000048/e1242_10q.htm.

financial statements as of and for the fiscal quarter ended March 31, 2019 without unreasonable effort and expense."[150]

157.     In all subsequent Quarterly Reports, the Company disclosed ongoing material weaknesses in its controls over financial reporting.

158.     On September 30, 2019, Enochian filed with the SEC its 2019 10-K.[151] In its 2018 10-K, as of August 2018, the Company's pipeline was reported as including the following products:[152]



159.     On November 25, 2019, Enochian filed with the SEC a Current Report on Form 8-K attaching a press release announcing an agreement "to acquire an exclusive, license for a treatment under development aimed to treat the Hepatitis B Virus (HBV) infections from G-Tech

---

[150] Form NT 10-K, ENOCHIAN BIOSCIENCES (May 16, 2019), available at https://www.sec.gov/Archives/edgar/data/1527728/000173112219000257/e1357_nt10q.htm.
[151] 2019 Form 10-K, ENOCHIAN BIOSCIENCES (Sept. 30, 2019), available at https://www.sec.gov/Archives/edgar/data/1527728/000173112219000575/e1514_10k.htm.
[152] Id.

Bio, LLC."[153] The Company stated in the press release that one of its lead drugs, "HV-01[,] was the original impetus for the conception of Enochian Biosciences' HIV focus," and that it was based "on an insight by Dr. Gümrükcü, drawn from a non-HIV field, that by adding an additional genetic modification to cells beyond those that protect cells from HIV infection could give a competitive advantage to the survival of the cells in HIV patients, leading to enhanced engraftment of the cells and increase the potential for a cure."[154] Enochian represented that the approach could "significantly reduce the therapies needed, potentially allowing the procedure to be done on an outpatient basis," and noted the "innovative mechanism of action designed to be developed into a potential cure for HBV."[155]

160.    The same press release described Gumrukcu as "the director of [SRI], a non-profit organization where he runs a research lab at the cutting edge of cell, gene and immunotherapy research," and represented the following regarding Gumrukcu's education and training:

> After receiving his preclinical training at the Dokuz Eylul University in 2004, [] Gümrükcü continued his training in various institutions and started working as a physician licensed by the Ministry of Health of Turkey in 2008. Later, after working under Dr. Suat Arusan in Turkey, Dr. Gümrükcü decided to explore further studies in the field of cell and gene therapies.[156]

161.    Professor Shimon Slavin, who was purported to be Gumrukcu's mentor, was quoted in the press release as confirming the representations about Gumrukcu's education and training: "Gümrükcü was a young post-doc with interesting ideas when I first met him eight years ago. I am looking forward to our future collaboration in developing and implementing novel cancer

---

[153] Form 8-K, *Enochian Biosciences Expands its Infectious Disease Pipeline by Entering into an Agreement in Principle to Acquire an Exclusive License for a Novel Hepatitis B Virus Treatment*, ENOCHIAN        BIOSCIENCES        (Nov.        25,        2019),        available        at https://www.sec.gov/Archives/edgar/data/1527728/000173112219000737/e1600_99-1.htm.
[154] *Id.*
[155] *Id.*
[156] *Id.*

treatments at [SRI]." Slavin also quoted as pointing to Gumrukcu's "unique research training," remarking that "he has become a prolific inventor, submitting various patent/provisional patent applications, which include several approaches aimed to treat deadly diseases, and for a novel vaccine for HIV among many others. Dr. Gümrükcü has licensed intellectual property related to HIV and several solid tumors to Enochian."[157]

162.    Dybul was quoted in the press release as stating: "Dr. Gümrükcü is one of those rare geniuses that is not bound by scientific discipline or dogma. He sees connections and opportunities often missed. His ideas are the purest kind: those that seem so obvious and simple once he has conceived of and explained them."[158]

163.    On December 10, 2019, Enochian filed with the SEC a Current Report on Form 8-K attaching a press release announcing a novel approach to potentially curing the Hepatitis B virus: "Gumrukcu, the inventor of products in the Enochian pipeline and Director of [SRI], presented the data at the HEP DART scientific conference in Kauai, Hawaii. The data were generated through a collaboration between SRI and Dr. Philippe Gallay of the Scripps Institute."[159]

164.    On September 23, 2020, Enochian filed with the SEC its 2020 10-K.[160] In its 2020 10-K, as of September 2020, the Company's pipeline was reported as including the following products:[161]

---

[157] *Id.*
[158] *Id.*
[159] Form 8-K, *Enochian Biosciences Announces Scientific Presentation of a Novel Approach to Potentially Cure Hepatitis B Virus*, ENOCHIAN BIOSCIENCES (Dec. 10, 2019), available at https://www.sec.gov/Archives/edgar/data/1527728/000173112219000774/e1621_99-1.htm.
[160] Form 10-K, ENOCHIAN BIOSCIENCES (Sept. 23, 2020), available at https://www.sec.gov/Archives/edgar/data/1527728/000173112220000975/e2119_10-k.htm.
[161] *Id.*

### HIV, HBV & Oncology: Pipeline Development

| Program | Indication | Discovery/Research | Pre-clinical | IND | Phase 1 | Phase 2 | Phase 3 |
|---------|-----------|-------------------|--------------|-----|---------|---------|---------|
| ENOB-HV-01 | Autologous HIV Curative Treatment | | | | | | |
| ENOB-HV-11 | Preventative HIV Vaccine | | | | | | |
| ENOB-HV-12 | Therapeutic HIV Vaccine | | | | | | |
| ENOB-HB-01 | Coopting HBV Polymerase | * | | | | | |
| ENOB-DC-01 | Off-The-Shelf DC Vaccine Pulsed With MCV Lysate | ** | | | | | |
| ENOB-DC-11 | Innovative DC Vaccine For Multiple Solid Tumors | *** | | | | | |
| ENOB-DC-21 | Nonspecific Vaccine For Intratumoral Injection | | | | | | |

HIV · HBV · Cancer

¹Enochian is currently in the early discovery phase of two additional product candidates related to our HIV pipeline. ENOB-HV-31, which is a gene therapy cure and ENOB-HV-32, which is a peptide drug for packaging and distribution.

* In partnership with Seraph Research Institute.
** MCV Vaccine Technology is a legacy Dandrit product candidate that is no longer being pursued by Enochian. However, based on the learning from working with this product, the Company has combined the technology with its innovative dendritic cell therapeutic platform ENOB-DC-01.
*** Enochian plans to initially target pancreatic cancer, triple negative breast cancer, glioblastoma, and renal cell carcinoma.

165.    In the 2020 10-K, the Company disclosed that is "highly dependent" on Gumrukcu and entities he controls or is affiliated with:[162]

> We are highly dependent on the services of third parties to conduct research and development of our pipeline, and our failure to maintain the services of such third parties could harm our business
>
> We are highly dependent on third parties working in conjunction with our officers, employees, scientific advisory board and research institutions in the research and development of product candidates in our pipeline. Many of the techniques utilized in the development of our product candidates have been developed by [] Gümrükcü, and we rely on the services of Dr. Gümrükcü, and of G-Tech Bio, LLC ["G-Tech"] and [SRI], in the continued development of our pipeline. Our future performance will depend on our ability to retain the services of Dr. Gümrükcü, [G-Tech] and SRI. The loss of the services of any of the foregoing, or of any of our key employees or scientific advisory board members could impede the achievement of our research, development, regulatory approvals and commercialization objectives.

166.    On March 24, 2021, Enochian filed with the SEC a Current Report on Form 8-K attaching a press release announcing a breakthrough cancer treatment developed through a

---

[162]  *Id.*

partnership between SRI and Enochian, which resulted in complete remission in a 36-year-old patient with recurrent glioblastoma for a period of 15 months. Enochian claimed that "[i]n compliance with U.S. Food and Drug Administration guidance, SRI treated the patient with natural killer (NK) and dendritic cells (DC) from a relative who had a partial genetic mismatch."[163]

167.    On June 16, 2021, the Company filed with the SEC a Form 424B5 ("Prospectus") announcing entry into a definitive securities purchase agreement with several institutional investors for the issuance and sale of an aggregate of 3,866,667 shares, or about $29 million worth, of its common stock at a price of $7.50 per share. Enochian represented that it intended to use the net proceeds from the offering for working capital and general corporate purposes. The securities were being offered pursuant to Enochian's shelf registration statement on Form S-3 (File No. 333-239837) filed with the SEC on July 13, 2020 and declared effective on July 20, 2020.

168.    The 2021 10-K was signed by Puche and all Individual Defendants. Defendant Dybul and Puche certified pursuant to SOX, that the 10-K fully complied with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the 2021 10-K fairly presented, in all material respects, the financial condition and results of operations of the Company.

169.    In the Prospectus, the Company represented that it was "committed to using our genetically modified cell, gene, and immune therapy technologies to prevent or potentially cure HIV, HBV as well as to potentially provide life-long cancer remission of some of the deadliest cancers. We do this by genetically modifying, or re-engineering, different types of human immune

---

[163] Form 8-K, *Seraph Research Institute and Enochian BioSciences Publish a Case Report of Complete Remission of Recurrent Glioblastoma with Innovative Therapy*, ENOCHIAN BIOSCIENCES (Mar. 24, 2019), available at https://www.sec.gov/Archives/edgar/data/1527728/000173112221000434/e2548_99-1.htm.

cells, depending on the therapeutic area and then injecting or returning the reengineered cells into a patient with HIV or some cancers to provide treatment or potentially cure."

170. The Prospectus further asserted that the Company planned to use the proceeds from the offering "to complete an exclusive license agreement to accelerate the development of an innovative technology to potentially treat and prevent all variants of COVID-19 and influenza viruses; and to advance two platform technologies with the potential to cure Hepatitis B Virus, HIV and many solid tumors beginning with pancreatic cancer; and for working capital and general corporate purposes."

171. And, through the Prospectus, Enochian again disclosed its reliance on Gumrukcu and his affiliates: "Many of the techniques utilized in the development of our product candidates have been developed by [] Gümrükcü, and we rely on the services of Dr. Gümrükcü, and of [G-Tech] and [SRI], in the continued development of our pipeline. Our future performance will depend on our ability to retain the services of Dr. Gümrükcü, [G-Tech] and [SRI]. The loss of the services of any of the foregoing, or of any of our key employees or scientific advisory board members could impede the achievement of our research, development regulatory approvals and commercialization objectives."

172. On September 24, 2021, Enochian filed with the SEC its 2021 10-K.[164] Enochian represented in the 2021 10-K that "[o]ur co-founder and inventor, [] Gumrukcu, who is also the Director of [SRI], submitted Pre-IND for ENOB-HV-21 an innovative treatment of Natural Killer (NK) and Gamma Delta T-Cells (GDT) collected from another person."[165]

---

[164] Form 10-K, ENOCHIAN BIOSCIENCES (Sept. 24, 2021), available at https://www.sec.gov/Archives/edgar/data/1527728/000173112221001565/e3109_10k.htm.
[165] *Id.*

173.    The 2021 10-K reiterated the risks in connection with Company's dependence on Gumrukcu and entities he controls or is affiliated with.[166]

174.    The 2021 10-K stated, "[o]ur future performance will depend on our ability to retain the services of [Gumrukcu], [G-Tech] and SRI. The loss of [their] services, or of any of our key employees or scientific advisory board members could impede the achievement of our research, development, regulatory approvals and commercialization objectives."[167]

175.    The 2021 10-K discussed the Company's rights under license agreements with "our licensors, including Weird Science and G-Tech, SRI and [] Gumrukcu that are important to our business," stating that "[o]ur research and development platform is built, in part, around patent rights licensed from such licensors."[168]

176.    In its 2021 10-K, as of September 2021, the Company's pipeline was reported as including the following products:[169]

---

[166]  *Id.*
[167]  *Id.*
[168]  *Id.*
[169]  *Id.*



| Program | Indication | /Research Discovery | Pre-clinical | IND | Phase 1 | Phase 2 | Phase 3 |
|---------|-----------|---------------------|--------------|-----|---------|---------|---------|
| ENOB-CV-01 | Coronavirus Treatment | | | | | | |
| ENOB-CV-11 | Coronavirus Prophylaxis | | | | | | |
| ENOB-FL-01 | Influenza Treatment | | | | | | |
| ENOB-FL-11 | Influenza Prophylaxis | | | | | | |
| ENOB-HV-01 | Autologous HIV Curative Treatment | Inexact Reld | | | | | |
| ENOB-HV-11 | Preventative HIV Vaccine | | | | | | |
| ENOB-HV-12 | Therapeutic HIV Vaccine | | | | | | |
| ENOB-HV-21 | HIV Natural Killer and Gamma Delta T-Cell Treatment or Cure | Pre-IND Scheduled | | | | | |
| ENOB-HV-31 | *In vivo* Gene Therapy | | | | | | |
| ENOB-HB-01 | Hijacking HBV Polymerase | Pre IND Scheduled | | | | | |
| ENOB-DC-01 | Hijacking HBV RNA | | | | | | |
| ENOB-DC-11 | Off the Shelf DC Vaccine for Multiple Solid Tumors | | | | | | |
| ENOB-DC-21 | Nonspecific Vaccine for Intratumoral Injection | | | | | | |

Coronavirus  Influenza  HIV¹  HBV  Cancer

¹Enochian is currently in the early discovery phase of a related HIV pipeline candidate, ENOB-HV-32, which is a peptide drug for packaging and distribution.

\* MCV Vaccine Technology is a legacy Dandrit product candidate that is no longer being pursued by Enochian. However, based on the learning from working with this product, the Company has combined the technology with its innovative dendritic cell therapeutic platform ENOB-DC-01.
\*\* Enochian plans to initially target pancreatic cancer.

177.    On October 28, 2021, Enochian filed with the SEC an amended Annual Report on Form 10-K/A—signed by Defendants Dybul and Puche—amending the Company's 2021 Annual Report, which contained substantively the same statements as in the original Annual Report, pertaining to the Company's consulting and licensing agreements with G-Tech and SRI.[170]

178.    According to the 2022 Proxy Statement, G-Tech and SRI are controlled by Gumrukcu and on April 18, 2021, the Company entered into a Statement of Work and License Agreement, by and among the Company, G-Tech and SRI, whereby the Company acquired a perpetual sublicensable, exclusive license to research, develop, and commercialize certain formulations which are aimed at preventing and treating forms of pancoronavirus, paninfluenza,

---

[170] Form 10-K/A, Enochian BioSciences (Oct. 28, 2021), available at https://www.sec.gov/Archives/edgar/data/1527728/000173112221001771/e3207_10ka.htm.

and combinations of the two diseases. As of June 30, 2021, the Company paid a $10 million up-front payment and $760,000 related to prior research costs to G-Tech and/or SRI. As of September 30, 2021, the Company paid an additional $75,000 to G-Tech and/or SRI.

179.    On October 17, 2022, the Company filed a Form 8-K that attached an investor presentation and a press release announcing "that it was awarded a U.S. patent for its proprietary cancer treatment platform that could potentially be used to induce life-long remission from some of the world's deadliest solid tumors," and that the technology had yielded positive and promising results in "proof-of-concept preclinical animal and laboratory studies."[171]

180.    A few days later, on October 21, 2022, the Company disclosed that it had received a notice from "The Nasdaq Stock Market LLC … stating that because the Company has not yet filed its Form 10-K, the Company is no longer in compliance with Nasdaq Listing Rule 5250(c)(1)," and "if the Company fails to timely regain compliance with the Nasdaq Listing Rule, the Company's common stock will be subject to delisting from Nasdaq."[172] In the same press release, the Company stated that it "currently believes the delay in the filing of the Form 10-K and Form 10-Q is due to one issue resulting from the continued work being done by a third-party valuator on a company asset."

181.    Then, on October 24, 2022, the Company filed another Form 8-K that attached a press release in which Dybul stated that the Company "continue[s] to prioritize the efficient

---

[171] Press Release, *Enochian BioSciences Awarded U.S. Patent For Its Promising Oncology Platform*, ENOCHIAN BIOSCIENCES (Oct. 17, 2022), available at https://www.sec.gov/Archives/edgar/data/1527728/000173111222001747/e4141_ex99-2.htm.

[172] Enochian, *Enochian BioSciences Announces Receipt of Notice from Nasdaq Regarding Delayed Filing of Annual Report on Form 10-K*, GLOBE NEWSWIRE (Oct. 21, 2022), available at https://www.globenewswire.com/news-release/2022/11/30/2565477/0/en/Enochian-BioSciences-Announces-Receipt-of-Notice-from-Nasdaq-Regarding-Delayed-Filing-of-Form-10-Q-for-the-Period-Ended-September-30-2022.html.

research, development, and commercialization of our promising oncology and HIV pipelines …
Enochian's future is bright, and we look forward to advancing potentially curative therapies for
some of the world's deadliest diseases."[173] The Company also announced that it had "filed a
complaint against Serhat Gumrukcu, William Anderson Wittekind, SG & AW Holdings LLC, and
Seraph Research Institute" for "engag[ing] in a concerted, deliberate scheme to alter, falsify, and
misrepresent to the Company the results of multiple studies supporting its Hepatitis B and SARS-
CoV-2/influenza pipelines," by "manipulat[ing] negative results to reflect positive outcomes from
various studies, and even fabricat[ing] studies out of whole cloth" through "brazen fraud, which
has caused Enochian substantial harm."[174]

182.    However, omitted from the Company's October 17, 2022 and October 24, 2022
press releases was the fact that Gumrukcu was the sole inventor of its oncology and HIV platforms,
and the sole inventor listed on the U.S. patent the Company had recently been awarded.[175]

183.    Remarkably, while the Company acknowledged that Gumrukcu (who had no formal
education after high school, let alone a M.D. and Ph.D.) had defrauded them in connection with
the Company's HBV and SARS-CoV-2/influenza pipelines, and has filed suit in connection with
the same, it has not conceded the same regarding the other technologies and approaches underlying

---

[173] Press Release, *Enochian BioSciences Forges Ahead With Focused Approach, Promising Future*, ENOCHIAN BIOSCIENCES (Oct. 24, 2022), available at https://www.sec.gov/Archives/edgar/data/1527728/000173112222001776/e4155_ex99-1.htm.
[174] *Id*.
[175] *See* Patent Grant 11413338, *Methods and compositions using recombinant dendritic cells for cancer therapy*, UNITED STATES PATENT AND TRADEMARK OFFICE (Aug. 16, 2022), available at https://uspto.report/patent/grant/11,413,338.

the remainder of its pipeline–notwithstanding that Gumrukcu was the sole inventor of everything.[176]

184. The reason for this inconsistency is simple: if the Company were to acknowledge that all of Gumrukcu's work was fraudulent, it would immediately have nothing–no real intellectual property, no pipeline, no substantial assets, and no future.

185. Finally, on the Company's current website, the Company's pipeline was revised to include the following products:[177]

| Program | Indication | Proof of Concept | Pre-IND | IND-Enabling | IND-SUB | Phase 1/2A |
|---------|-----------|------------------|---------|--------------|---------|------------|
| ENOB-DC-11* | Dendritic Cell Therapeutic Vaccine for Pancreatic Cancer | | EARLY/MID 2023 | | LATE 2023/ EARLY 2024 | |
| ENOB-DC-12-XX | Dendritic Cell Therapeutic Vaccine for Other Solid Tumors (TBD) | | | | | |
| ENOB-HV-12* | HIV Therapeutic Vaccine | | MID/LATE 2023 | | EARLY/MID 2024 | |
| ENOB-HV-21 | HIV Natural Killer & Gamma Delta T-Cell Treatment or Cure | | | | | |
| ENOB-HV-01** | HIV Autologous Transplant | | | | | |
| ENOB-HB-01 | HBV Gene Therapy | | | | | |

CANCER    HIV    HBV

*Tier 1 Programs
** Enochian has entered into a profit-sharing sub-license with Caring Cross for a key component of this technology

186. Clearly, numerous programs have been dropped since the version of the pipeline that was disclosed in the 2021 10-K. All of the products were invented by Gumrukcu, and several of those that were removed can be explained through the Company's lawsuit against Gumrukcu.

---

[176] *See* Patent Applications and Registrations, Enochian BioPharma, Inc., UNITED STATES PATENT AND TRADEMARK OFFICE (Dec. 8, 2022), available at https://uspto.report/company/Enochian-Biopharma-Inc; Patent Applications and Registrations, Serhat Gumrukcu, UNITED STATES PATENT AND TRADEMARK OFFICE (Dec. 8, 2022), available at https://uspto.report/company/Gumrukcu-Serhat/patents.

[177] Pipeline, ENOCHIAN BIOSCIENCES (Jan. 6, 2023), available at https://enochianbio.com/Pipeline--Technology/Overview/default.aspx.

The others remain unexplained, further adding to the suspicious nature of Gumrukcu's inventions and the Company's current pipeline.

### D. Enochian's False and/or Misleading Proxy Statements

187.    On May 22, 2020, the Company filed its 2020 Proxy Statement with the SEC, soliciting shareholder votes to, among other things, re-elect Defendants Sindlev, Dybul, Brosgart, Alton, Sapirstein, Sandler, and Grønfeldt-Sørensen to the Board.[178]

188.    The 2020 Proxy Statement represented that the Board was exercising its risk oversight function directly and through the Audit Committee. It also provided that the Board "regularly discusses with management the Company's major risk exposures including compensation risk, their potential financial impact on the Company, and the steps taken to monitor and control those risks."[179]

189.    The 2020 Proxy Statement enumerated various related party transactions with Gumrukcu and entities controlled by him, but made no disclosure regarding Gumrukcu's criminal past, lack of credentials, and the lack of scientific merit in the technologies he purported to develop for the Company.[180]

190.    On June 29, 2020, Enochian filed a Form 8-K disclosing that Defendants Sindlev, Dybul, Grønfeldt-Sørensen, Sapirstein, Sandler, Alton and Brosgart were reelected as directors pursuant to the Board's solicitation of votes therefor.[181]

---

[178] 2020 Proxy Statement, ENOCHIAN BIOSCIENCES (May 22, 2020), available at https://www.sec.gov/Archives/edgar/data/1527728/000173112220000559/e1945_def14a.htm.
[179] *Id.*
[180] *Id.*
[181] Form 8-K, ENOCHIAN BIOSCIENCES (June 29, 2020), available at https://www.sec.gov/Archives/edgar/data/1527728/000173112220000699/e2004_8k.htm.

191.     On February 3, 2021, the Company filed its 2021 Proxy Statement with the SEC, soliciting shareholder votes to, among other things, re-elect Defendants Sindlev, Dybul, Brosgart, Alton, Sapirstein, Sandler, and Grønfeldt-Sørensen to the Board.[182]

192.     The 2021 Proxy Statement represented that the Board was exercising its risk oversight function directly and through the Audit Committee. It also provided that the Board "regularly discusses with management the Company's major risk exposures including compensation risk, their potential financial impact on the Company, and the steps taken to monitor and control those risks."[183]

193.     The 2021 Proxy Statement enumerated various related-party transactions with Gumrukcu and entities controlled by him, but made no disclosure regarding Gumrukcu's criminal past, lack of credentials, and the lack of scientific merit in the technologies he purported to develop for the Company.[184]

194.     On March 10, 2021, Enochian filed a Form 8-K disclosing that Defendants Sindlev, Dybul, Brosgart, Alton, Sapirstein, Sandler, and Grønfeldt-Sørensen were reelected as directors pursuant to the Board's solicitations of votes therefor.[185]

195.     On January 27, 2022, the Company filed its 2022 Proxy Statement with the SEC, soliciting shareholder votes to, among other things, re-elect Defendants Sindlev, Dybul, Brosgart, Alton, Sapirstein, Sandler, Grønfeldt-Sørensen, and McNicol to the Board.[186]

---

[182] 2021 Proxy Statement, ENOCHIAN BIOSCIENCES (Feb. 3, 2021), available at https://www.sec.gov/Archives/edgar/data/1527728/000173112221000160/e2406_def14a.htm.
[183] *Id.*
[184] *Id.*
[185] Form 8-K, ENOCHIAN BIOSCIENCES (Mar. 10, 2021), available at https://www.sec.gov/Archives/edgar/data/1527728/000173112221000344/e2505_8k.htm.
[186] 2022 Proxy Statement, ENOCHIAN BIOSCIENCES (Jan. 27, 2022), available at https://www.sec.gov/Archives/edgar/data/1527728/000173112222000109/e3449_def14a.htm.

196.    The 2022 Proxy Statement represented that the Board was exercising its risk oversight function directly and through the Audit Committee. It also provided that the Board "regularly discusses with management the Company's major risk exposures including compensation risk, their potential financial impact on the Company, and the steps taken to monitor and control those risks."[187]

197.    The 2022 Proxy Statement enumerated various related-party transactions with Gumrukcu and entities controlled by him, but made no disclosure regarding Gumrukcu's criminal past, lack of credentials, and the lack of scientific merit in the technologies he purported to develop for the Company.[188]

198.    Each of the foregoing Proxy Statements was materially false and misleading and omitted material information. In actuality, the Board and Audit Committee lacked necessary and adequate internal controls and failed to oversee the Company's major risk exposures and their potential impact upon the Company, notwithstanding the knowledge of at least some members of the Board that Gumrukcu had a criminal past and that his purported credentials were subject to serious doubt.

199.    The Individual Defendants also failed to disclose the truth about Gumrukcu, his criminal past, lack of a medical degree, lack of a Ph.D., and lack of scientific training despite causing, or authorizing, the payment of massive amounts of Company funds to him and entities controlled by him.

---

[187] *Id.*
[188] *Id.*

200.     On March 16, 2022, Enochian filed a Form 8-K disclosing that Defendants Sindlev, Dybul, Brosgart, Alton, Sapirstein, Sandler, Grønfeldt-Sørensen, and McNicol were reelected as directors pursuant to the Board's solicitations of votes therefor.[189]

**E.  Enochian Sued in Securities Class Action Lawsuits**

201.     On July 26, 2022, a securities class action complaint was filed, captioned *Chow v. Enochian Biosciences Inc.*, No. 22-cv-01374-DMG-AFM (C.D. Cal.), on behalf of all purchasers of Enochian securities between September 24, 2020 and May 31, 2022. *Chow* charges the Company, Defendants Dybul, Sindlev, Brosgart, Alton, Sapirstein, Sandler Grønfeldt-Sørensen, McNicol, as well as Enochian's CFO Luisa Puche, and former Board member Evelyn D'an with violations of sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

202.     *Chow* alleges that the defendants made false and misleading statements and failed to disclose that: (i) Gumrukcu was not a licensed doctor and had no verifiable degrees beyond high school; (ii) there were no scientific and technological underpinnings to Enochian's product pipeline, purportedly invented by Gumrukcu; (iii) the commercial prospects for the Company's product pipeline were overstated; (iv) Gumrukcu had a criminal history that included fraud; and (v) reliance on Gumrukcu, and its consulting and licensing agreements with G-Tech and SRI, subjected the Company to a heightened risk of reputational and financial harm, as well as threatened the integrity of the Company's scientific findings.

203.     On July 28, 2022, a securities class action complaint was filed, captioned *Manici v. Enochian Biosciences Inc.*, No. 22-cv-05237 (C.D. Cal.), on behalf of all purchasers of Enochian securities between January 17, 2018, and June 27, 2022, inclusive. *Manici* charges the Company,

---

[189] Form 8-K, ENOCHIAN BIOSCIENCES (Mar. 16, 2022), available at https://www.sec.gov/Archives/edgar/data/1527728/000173112222000459/e3617_8-k.htm.

Defendant Dybul, Leire, Robert Wolfe, Enochian's former CFO and Chief Accounting Officer, and CFO Puche with violations of sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

204. *Manici* alleges that the defendants made false and misleading statements and failed to disclose that: (i) co-founder and inventor Gumrukcu was engaged in a variety of frauds; (ii) Gumrukcu was not a licensed doctor; (iii) Gumrukcu's purported contributions to the Company lacked a reasonable basis; (iv) the Company had overstated its commercial prospects; and (v) Gumrukcu had improperly diverted approximately $20 million from Enochian to entities he owned.

### F. Enochian Sues Gumrukcu

205. On October 21, 2022, Enochian filed the Enochian Action against Gumrukcu, Wittekind, G-Tech, SG & AW Holdings LLC, and SRI, seeking damages for claims of breach of contract, breach of the implied covenant of good faith and fair dealing, intentional misrepresentation/fraud, fraudulent concealment, fraudulent nondisclosure, negligent misrepresentation, civil conspiracy, unjust enrichment, and unfair business practices.

206. While the Enochian Action seeks to recover damages of up to $25 million for payments made to Gumrukcu and his affiliates under the Framework Agreement, HBV Agreement, and COVID Agreement, even a full recovery of the damages sought would not make the Company whole.

207. As the Framework Agreement was not effective until November 15, 2019, the HBV Agreement was not effective until January 31, 2020, and the COVID Agreement was not effective until April 18, 2021, the Enochian Action only seeks damages related to direct payments to Gumrukcu, for work he conducted after November 15, 2019.

## DEMAND FUTILITY ALLEGATIONS

208. Plaintiff brings this action derivatively on behalf of Enochian to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' and Gurmrukcu's breaches of their fiduciary duties as directors, officers, and controlling shareholders of Enochian, abuse of control, and gross mismanagement, as well as the aiding and abetting thereof.

209. Enochian is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

210. Plaintiff is, and has been at all relevant times, a stockholder of Enochian, and was a stockholder of the Company at the time of the transactions alleged herein. Plaintiff will adequately and fairly represent the interests of Enochian and its shareholders in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

211. Under the circumstances presented herein, demand is futile and, thus, excused.

### A. Demand Upon Sindlev is Excused

212. As conceded in the Company's public filings, as Enochian's co-founder and the Chairman of the Board since June 2018, Sindlev is not an independent director. Indeed, Enochian's 2022 Proxy Statement does not list Sindlev as an independent director.

213. Sindlev would not sue those responsible for the wrongdoing pled herein because doing so would involve suing himself, and question the basis of his own investments. As of January 24, 2022, Sindlev owned 9,702,808 shares—or 18.42%—of Enochian common stock. If Sindlev admitted that he, Enochian, or others engaged in misconduct, his investment in Enochian would be substantially devalued.

214. Further, if Sindlev acknowledged that directors, officers, or employees at Enochian engaged in the wrongdoing alleged, he would be acknowledging that he, as co-founder, Chairman

of the Board, and a controlling shareholder with long-term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing.

215. Further, Sindlev approved the Proxy Statements that were disseminated between 2020 and 2022, which offered materially false and/or misleading statements and material omissions. Therefore, Sindlev faces a substantial likelihood of liability under Section 14(a) of the Exchange Act, and he is incapable of considering a demand.

216. Sindlev also materially benefitted from the Company's violation of Section 14(a) of the Exchange Act, because the false and/or misleading statements and material omissions in the Company's Proxy Statements caused his re-election to the Enochian Board.

217. Sindlev is also a named defendant in one of the pending class action lawsuits, and could not independently consider a demand to commence and vigorously prosecute the claims that are derivatively asserted in this action.

218. Sindlev's history also presents conflicts of interest involving Gumrukcu that establish that demand upon him would be futile, and is thus excused.

219. Indeed, Sindlev has maintained a long-standing business relationship with Gumrukcu, and has invested in several of Gumrukcu's companies since 2017, when he first hired Gumrukcu as a Dandrit consultant.

220. Moreover, by admitting that he knew that Gumrukcu had been charged for 14 felony counts, but withheld that information and moved forward to complete the Enochian acquisition, and later expanded the financial relationship between Enochian and Gumrukcu, Sindlev has established that he is neither disinterested nor independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of federal securities laws.

221.    In connection with his relationship to other members of the Board, Sindlev and Grønfeldt-Sørensen have maintained strong and long-standing business and personal ties, precluding both from possibly acting in an independent and disinterested manner. Indeed, Sindlev and Grønfeldt-Sørensen have worked closely together for more than ten years. For example: (i) Sindlev is the founder and prime operator of the RS Group Companies (*i.e.*, family offices in Denmark with global investments in the real estate, charter, food & beverage, private hospital, and biosciences industries), and, in October 2012, Grønfeldt-Sørensen was named CEO of several affiliated companies, including RS Group ApS, RS Arving ApS, RS Family ApS, and RS Newton ApS; (ii) Sindlev is the founder and prime operator of Dr. Smood Group, Inc., and, since January 2014, Grønfeldt-Sørensen has been a director of Dr. Smood Group, Inc.; and (iii) according to a FinansWatch article, Sindlev and Grønfeldt-Sørensen have been friends for years.[190]

222.    Sindlev, as a director of Enochian, was required to, but failed to: (i) ensure that the Company operated within the confines of all relevant laws, rules, and regulations governing the Company's core operations; (ii) implement and maintain an effective system of internal controls to monitor the material risks posed to the Company and to ensure the Company was complying with all laws, rules, and regulations governing Enochian's core operations; (iii) implement and maintain an effective system of internal controls and corporate governance practices and procedures to ensure that the Company's SEC filings and statements to investors were truthful, complete, and accurate; and (iv) take action when presented with red flags pointing to misconduct.

---

[190] Kasper Kronenberg, *Pandora billionaire is dissolving his company - yet he has invested in a new one*, FINANSWATCH (July 3, 2022), available at https://finans.dk/erhverv/ECE13788062/pandoramilliardaer-er-ved-at-oploese-sit-selskab-alligevel-har-han-investeret-i-et-nyt/.

223. Thus, Sindlev is neither disinterested nor independent and any demand upon him is futile and, therefore, excused.

**B. Demand Upon Dybul is Excused**

224. As conceded in the Company's public filings, as Enochian's CEO and principal executive officer since July 1, 2021, and Executive Chairman of the Board since January 2019, Dybul is not an independent director. In fact, Enochian's 2022 Proxy Statement does not list Dybul as an independent director.

225. As an employee of Enochian, Dybul derives substantially all his income from his employment with the Company, including his 2021 base salary of $430,000. Thus, he could not consider a demand for action that might require him to sue directors that control his continued employment or fellow members of management with whom he works on a day-to-day basis.

226. Dybul would not sue those responsible for the wrongdoing pled herein because doing so would involve suing himself, and question the basis of his own investments. As of January 24, 2022, Dybul owned 828,906 shares—or 1.55%—of Enochian common stock. If Dybul admitted that he, Enochian, or others engaged in misconduct, his investment in Enochian would be substantially devalued. Further, if Dybul acknowledged that executives at Enochian had engaged in the wrongdoing alleged, he effectively would be admitting that he, as CEO of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

227. Further, Dybul approved the Proxy Statements that were disseminated between 2020 and 2022, which offered materially false and/or misleading statements and material omissions. Therefore, Dybul faces a substantial likelihood of liability under Section 14(a) of the Exchange Act, and he is incapable of considering a demand.

228. Dybul also materially benefitted from the Company's violation of Section 14(a) of the Exchange Act, because the false and/or misleading statements and material omissions in the

Company's Proxy Statements caused the re-election of the directors that selected him as the Company's CEO.

229. Dybul is also a named defendant in both of the pending class action lawsuits, and could not independently consider a demand to commence and vigorously prosecute the claims that are derivatively asserted in this action.

230. Dybul's history also presents conflicts of interest involving Gumrukcu that establish that demand upon him would be futile, and is thus excused.

231. Indeed, in September 2020, Dybul wrote a character reference letter to the Istanbul High Criminal Court on Gumrukcu's behalf, impliedly conceding knowledge of Gumrukcu's criminal past, and the affirmative decision not to disclose material information about the same.

232. Dybul, as a director and officer of Enochian, was required, but failed to: (i) ensure that the Company operated within the confines of all relevant laws, rules, and regulations governing the Company's core operations; (ii) implement and maintain an effective system of internal controls to monitor the material risks posed to the Company and to ensure the Company was complying with all laws, rules, and regulations governing Enochian's core operations; (iii) implement and maintain an effective system of internal controls and corporate governance practices and procedures to ensure that the Company's SEC filings and statements to investors were truthful, complete, and accurate; and (iv) take action when presented with red flags pointing to misconduct.

233. Thus, Dybul is neither disinterested nor independent and any demand upon Dybul is futile and, therefore, excused.

## C. Demand Upon Brosgart is Excused

234.     Brosgart has been an Enochian director since December 2019, and is the Chairperson of Enochian's Scientific Advisory Board.[191] Thus, she could not impartially consider a demand related to her own failures to detect, or her decision to acquiesce in, Gumrukcu's long-running fraud.

235.     Brosgart would not sue those responsible for the wrongdoing pled herein because doing so would involve suing herself. As of January 24, 2022, Brosgart owned 41,049 shares of Enochian common stock. If Brosgart admitted that she, Enochian, or others engaged in misconduct, her investment in Enochian would be substantially devalued. Further, if Brosgart acknowledged that executives at Enochian had engaged in the wrongdoing alleged, she effectively would be admitting that she, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

236.     Further, Brosgart approved the Proxy Statements that were disseminated between 2020 and 2022, which offered materially false and/or misleading statements and material omissions. Therefore, Brosgart faces a substantial likelihood of liability under Section 14(a) of the Exchange Act, and she is incapable of considering a demand.

237.     Brosgart also materially benefitted from the Company's violation of Section 14(a) of the Exchange Act, because the false and/or misleading statements and material omissions in the Company's Proxy Statements caused her re-election to the Enochian Board.

238.     Brosgart is also a named defendant in both of the pending class action lawsuits, and could not independently consider a demand to commence and vigorously prosecute the claims that are derivatively asserted in this action.

---

[191] ENO220-01216.

239.    Brosgart's history also presents conflicts of interest involving Gumrukcu that establish that demand upon her would be futile, and is thus excused.

240.    Indeed, in September 2020, Brosgart wrote a character reference letter to the Istanbul High Criminal Court on Gumrukcu's behalf, impliedly conceding knowledge of Gumrukcu's criminal past, and the affirmative decision not to disclose material information about the same.

241.    In connection with her relationship to other members of the Board, Brosgart, Alton, and Sapirstein have maintained strong and long-standing business and personal ties, precluding them from possibly acting in an independent and disinterested manner.

242.    Indeed, Brosgart, Alton, and Sapirstein have worked closely together for more than twenty years. For example: (i) they all worked together at Gilead Sciences, Inc. from 2000-2002; (ii) Brosgar and Sapirstein worked together at Tobira Therapeutics, Inc. from 2009-2016, with Sapirstein serving as the CEO and Brosgart as a member of the company's board of directors; and (iii) in January 2015, Sapirstein, as CEO of ContraVir Pharmaceuticals, Inc., recruited Brosgart to work on the company's scientific advisory board, in support of its development of targeted antiviral therapies.[192]

243.    Further, in the press release announcing Brosgart's hire, Sapirstein acknowledged their history together, noting: "I am excited to work with Dr. Brosgart again after working together at Gilead on the clinical development of tenofovir as well as on the Board of Tobira…. There is no

---

[192] Press Release, *ContraVir Pharmaceuticals Adds Carol L. Brosgart, M.D., To Scientific Advisory Board*, BIOSPACE (Jan. 20, 2015), available at https://www.biospace.com/article/releases/contravir-pharmaceuticals-adds-b-carol-l-brosgart-m-d-b-to-scientific-advisory-board-/.

one I trust more than her to provide advice and guidance, particularly for our HBV program, given her experience in this space."[193]

244.     Brosgart, as a director of Enochian, was required to, but failed to: (i) ensure that the Company operated within the confines of all relevant laws, rules, and regulations governing the Company's core operations; (ii) implement and maintain an effective system of internal controls to monitor the material risks posed to the Company and to ensure the Company was complying with all laws, rules, and regulations governing Enochian's core operations; (iii) implement and maintain an effective system of internal controls and corporate governance practices and procedures to ensure that the Company's SEC filings and statements to investors were truthful, complete, and accurate; and (iv) take action when presented with red flags pointing to misconduct.

245.     Brosgart further failed to uphold her additional obligations as a member of the Nominating and Corporate Governance Committee, which include, *inter alia*, ensuring the implementation and effectiveness of Enochian's Corporate Governance Guidelines.

246.     Thus, Brosgart is neither disinterested nor independent and any demand upon Brosgart is futile and, therefore, excused.

**D. Demand Upon Alton is Excused**

247.     Alton has been an Enochian director since December 2019. Alton would not sue those responsible for the wrongdoing pled herein because doing so would involve suing himself.

248.     As of January 24, 2022, Alton owned 41,049 shares of Enochian common stock. If Alton admitted that he, Enochian, or others engaged in misconduct, his investment in Enochian would be substantially devalued. Further, if Alton acknowledged that executives at Enochian had

---

[193] *Id.*

engaged in the wrongdoing alleged, he effectively would be admitting that she, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

249.    Further, Alton approved the Proxy Statements that were disseminated between 2020 and 2022, which offered materially false and/or misleading statements and material omissions. Therefore, Alton faces a substantial likelihood of liability under Section 14(a) of the Exchange Act, and he is incapable of considering a demand.

250.    Alton also materially benefitted from the Company's violation of Section 14(a) of the Exchange Act, because the false and/or misleading statements and material omissions in the Company's Proxy Statements caused his re-election to the Enochian Board.

251.    Alton is also a named defendant in one of the pending class action lawsuits, and could not independently consider a demand to commence and vigorously prosecute the claims that are derivatively asserted in this action.

252.    In connection with his relationship to other members of the Board, Alton, Brosgart, and Sapirstein have maintained strong and long-standing business and personal ties, precluding them from possibly acting in an independent and disinterested manner.

253.    Indeed, Alton, Brosgart, and Sapirstein have worked closely together for more than twenty years. For example: (i) they all worked together at Gilead Sciences, Inc. from 2000-2002; and (ii) Alton and Brosgart worked together at Gilead Sciences, Inc. from 1999-2009.

254.    Alton, as a director of Enochian, was required, but failed to: (i) ensure that the Company operated within the confines of all relevant laws, rules, and regulations governing the Company's core operations; (ii) implement and maintain an effective system of internal controls to monitor the material risks posed to the Company and to ensure the Company was complying with all laws, rules, and regulations governing Enochian's core operations; (iii) implement and

maintain an effective system of internal controls and corporate governance practices and procedures to ensure that the Company's SEC filings and statements to investors were truthful, complete, and accurate; and (iv) take action when presented with red flags pointing to misconduct.

255.    As a member of the Audit Committee, Alton had duties regarding oversight of the risks facing the Company and its compliance with relevant laws, rules, and regulations. Alton utterly failed to perform these essential duties.

256.    Alton also failed to uphold his additional obligations as Chair of the Nominating and Corporate Governance Committee, which include, *inter alia*, ensuring the implementation and effectiveness of Enochian's Corporate Governance Guidelines.

257.    Alton is neither disinterested nor independent and any demand upon Alton is futile and, therefore, excused.

### E.  Demand Upon Sapirstein is Excused

258.    Sapirstein has been an Enochian director since March 2018. Sapirstein would not sue those responsible for the wrongdoing pled herein because doing so would involve suing himself.

259.    As of January 24, 2022, Sapirstein owned 75,502 shares of Enochian common stock. If Sapirstein admitted that he, Enochian, or others engaged in misconduct, his investment in Enochian would be substantially devalued. Further, if Sapirstein acknowledged that executives at Enochian had engaged in the wrongdoing alleged, he effectively would be admitting that he, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

260.    Further, Sapirstein approved the Proxy Statements that were disseminated between 2020 and 2022, which offered materially false and/or misleading statements and material omissions. Therefore, Sapirstein faces a substantial likelihood of liability under Section 14(a) of the Exchange Act, and he is incapable of considering a demand.

261.     Sapirstein also materially benefitted from the Company's violation of Section 14(a) of the Exchange Act, because the false and/or misleading statements and material omissions in the Company's Proxy Statements caused his re-election to the Enochian Board.

262.     Sapirstein is also a named defendant in one of the pending class action lawsuits, and could not independently consider a demand to commence and vigorously prosecute the claims that are derivatively asserted in this action.

263.     In connection with his relationship to other members of the Board, Sapirstein, Brosgart, and Alton have maintained strong and long-standing business and personal ties, precluding them from possibly acting in an independent and disinterested manner.

264.     Indeed, Sapirstein, Brosgart, and Alton have worked closely together for more than twenty years. For example: (i) they all worked together at Gilead Sciences, Inc. from 2000-2002; (ii) Brosgar and Sapirstein worked together at Tobira Therapeutics, Inc. from 2009-2016, with Sapirstein serving as the CEO and Brosgart as a member of the company's board of directors; and (iii) in January 2015, Sapirstein, as CEO of ContraVir Pharmaceuticals, Inc., recruited Brosgart to work on the company's scientific advisory board, in support of its development of targeted antiviral therapies.[194]

265.     Further, in the press release announcing Brosgart's hire, Sapirstein acknowledged their history together, noting: "I am excited to work with Dr. Brosgart again after working together at Gilead on the clinical development of tenofovir as well as on the Board of Tobira…. There is no

---

[194] Press Release, *ContraVir Pharmaceuticals Adds Carol L. Brosgart, M.D., To Scientific Advisory Board*, BIOSPACE (Jan. 20, 2015), available at https://www.biospace.com/article/releases/contravir-pharmaceuticals-adds-b-carol-l-brosgart-m-d-b-to-scientific-advisory-board-/.

one I trust more than her to provide advice and guidance, particularly for our HBV program, given her experience in this space."[195]

266.    Sapirstein, as a director of Enochian, was required to, but failed to: (i) ensure that the Company operated within the confines of all relevant laws, rules, and regulations governing the Company's core operations; (ii) implement and maintain an effective system of internal controls to monitor the material risks posed to the Company and to ensure the Company was complying with all laws, rules, and regulations governing Enochian's core operations; (iii) implement and maintain an effective system of internal controls and corporate governance practices and procedures to ensure that the Company's SEC filings and statements to investor were truthful, complete, and accurate; and (iv) take action when presented with red flags pointing to misconduct.

267.    Moreover, as a member of the Audit Committee, Sapirstein had duties regarding oversight of the risks facing the Company and Enochian's compliance with relevant laws, rules, and regulations. Sapirstein utterly failed to perform these essential duties.

268.    Sapirstein is neither disinterested nor independent and any demand upon Sapirstein is futile and, therefore, excused.

**F.  Demand Upon Grønfeldt-Sørensen is Excused**

269.    Grønfeldt-Sørensen has been an Enochian director since October 2017. Grønfeldt-Sørensen would not sue those responsible for the wrongdoing pled herein because doing so would involve suing himself.

270.    As of January 24, 2022, Grønfeldt-Sørensen owned 77,269 shares of Enochian common stock. If Grønfeldt-Sørensen admitted that he, Enochian, or others engaged in

---

[195] *Id.*

misconduct, his investment in Enochian would be substantially devalued. Further, if Grønfeldt-Sørensen acknowledged that executives at Enochian had engaged in the wrongdoing alleged, he effectively would be admitting that he, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

271.     Further, Grønfeldt-Sørensen approved the Proxy Statements that were disseminated between 2020 and 2022, which offered materially false and/or misleading statements and material omissions. Therefore, Grønfeldt-Sørensen faces a substantial likelihood of liability under Section 14(a) of the Exchange Act, and he is incapable of considering a demand.

272.     Grønfeldt-Sørensen also materially benefitted from the Company's violation of Section 14(a) of the Exchange Act, because the false and/or misleading statements and material omissions in the Company's Proxy Statements caused his re-election to the Enochian Board.

273.     Grønfeldt-Sørensen is also a named defendant in one of the pending class action lawsuits, and could not independently consider a demand to commence and vigorously prosecute the claims that are derivatively asserted in this action.

274.     In connection with his relationship to other members of the Board, Grønfeldt-Sørensen and Sindlev have maintained strong and long-standing business and personal ties, precluding both from possibly acting in an independent and disinterested manner. Indeed, Grønfeldt-Sørensen and Sindlev have worked closely together for more than ten years. For example: (i) Sindlev is the founder and prime operator of the RS Group Companies (*i.e.*, family offices in Denmark with global investments in the real estate, charter, food & beverage, private hospital, and biosciences industries), and, in October 2012, Grønfeldt-Sørensen was named CEO of several affiliated companies, including RS Group ApS, RS Arving ApS, RS Family ApS, and RS Newton ApS; (ii) Sindlev is the founder and prime operator of Dr. Smood Group, Inc., and,

since January 2014, Grønfeldt-Sørensen has been a director of Dr. Smood Group, Inc.; and (iii) according to a FinansWatch article, Sindlev and Grønfeldt-Sørensen have been friends for years.[196]

275.    Grønfeldt-Sørensen, as a director of Enochian, was required to, but failed to: (i) ensure that the Company operated within the confines of all relevant laws, rules, and regulations governing the Company's core operations; (ii) implement and maintain an effective system of internal controls to monitor the material risks posed to the Company and to ensure the Company was complying with all laws, rules, and regulations governing Enochian's core operations; (iii) implement and maintain an effective system of internal controls and corporate governance practices and procedures to ensure that the Company's SEC filings and statements to investor were truthful, complete, and accurate; and (iv) take action when presented with red flags pointing to misconduct.

276.    Grønfeldt-Sørensen is neither disinterested nor independent and any demand upon Grønfeldt-Sørensen is futile and, therefore, excused.

### G. Demand Upon McNicol is Excused

277.    McNicol has been an Enochian director, and the Chairwoman of Enochian's Audit Committee since May 2021. Thus, she could not impartially consider a demand related to her own failures to detect, or her decision to acquiesce in, Gumrukcu's long-running fraud.

278.    If McNicol admitted that she, Enochian, or the executives at Enochian had engaged in the wrongdoing alleged, she effectively would be admitting that she, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

---

[196] Kasper Kronenberg, *Pandora billionaire is dissolving his company - yet he has invested in a new one*, FINANSWATCH (July 3, 2022), available at https://finans.dk/erhverv/ECE13788062/pandoramilliardaer-er-ved-at-oploese-sit-selskab-alligevel-har-han-investeret-i-et-nyt/.

279. Further, McNicol approved the Proxy Statement that was disseminated in 2022, which offered materially false and/or misleading statements and material omissions. Therefore, McNicol faces a substantial likelihood of liability under Section 14(a) of the Exchange Act, and he is incapable of considering a demand.

280. McNicol also materially benefitted from the Company's violation of Section 14(a) of the Exchange Act, because the false and/or misleading statements and material omissions in the Company's Proxy Statements caused her re-election to the Enochian Board.

281. McNicol is also a named defendant in one of the pending class action lawsuits, and could not independently consider a demand to commence and vigorously prosecute the claims that are derivatively asserted in this action.

282. McNicol, as a director of Enochian, was required, but failed to: (i) ensure that the Company operated within the confines of all relevant laws, rules, and regulations governing the Company's core operations; (ii) implement and maintain an effective system of internal controls to monitor the material risks posed to the Company and to ensure the Company was complying with all laws, rules, and regulations governing Enochian's core operations; (iii) implement and maintain an effective system of internal controls and corporate governance practices and procedures to ensure that the Company's SEC filings and statements to investors were truthful, complete, and accurate; and (iv) take action when presented with red flags pointing to misconduct.

283. As the Chairwoman of the Audit Committee, McNicol had duties regarding oversight of the risks facing the Company and its compliance with relevant laws, rules, and regulations. McNicol utterly failed to perform these essential duties.

284. McNicol is neither disinterested nor independent and any demand upon McNicol is futile and, therefore, excused.

**H. Other Factors Demonstrating that Demand Upon the Individual Defendants is Futile**

285.     Enochian has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not caused the Company to take action to recover all potential damages for the Company related to the harm it has suffered and will continue to suffer.

286.     The Board was put on notice of legal and ethical violations at Enochian, and breaches of its Code of Conduct, as well as other misconduct, but failed to act against those responsible. Timely action could have prevented, or at least minimized, the damage caused to Enochian by such misconduct.

287.     The members of the Board received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

## COUNT I
**(Derivatively Against Individual Defendants for Breach of Fiduciary Duties)**

288.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

289.     The Individual Defendants owed and owe fiduciary duties to Plaintiff and Enochian's shareholders. By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe to Plaintiff and Enochian's shareholders the highest obligation of good faith, loyalty, and due care.

290.     The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties regarding prudently

managing the business of Enochian in a manner consistent with the duties imposed upon them by law.

291. By committing the misconduct alleged herein, the Individual Defendants breached their duties of good faith and loyalty in the management and administration of Enochian's affairs and in the use and preservation of Enochian's assets.

292. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Enochian has sustained significant damages, not only monetarily, but also to its corporate image and goodwill. Such damages include, among other things, the costs of defending and resolving the securities class actions.

293. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company and its stockholders.

294. Plaintiff, on Enochian's behalf, has no adequate remedy at law.

## COUNT II
**(Derivatively Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 Promulgated Thereunder)**

295. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

296. The section 14(a) claim alleged herein is based solely on negligence. It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The section 14(a) claim alleged herein does not allege and does not sound in fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

297. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate

commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

298. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

299. The 2020-2022 Proxy Statements were materially false and misleading and omitted material information. In actuality, the Board and Audit Committee lacked necessary and adequate internal controls and failed to oversee the Company's major risk exposures and their potential impact upon the Company, notwithstanding the knowledge of at least some members of the Board that Gumrukcu had a criminal past and that his purported credentials were subject to serious doubt. The Individual Defendants failed to disclose the truth about Gumrukcu, his criminal past, lack of a medical degree, lack of a Ph.D., and lack of scientific training despite causing or authorizing the payment of millions in Company funds to him and entities controlled by him.

300. The false and misleading information contained in the 2020-2022 Proxy Statements was material to Enochian's shareholders in determining whether to elect the relevant directors to the Board.

301. The material misstatements and omissions in the Proxy Statements damaged the Company.

302. Plaintiff, on behalf of Enochian, seeks relief for damages inflicted upon the Company based on the false and misleading Proxy Statements in connection with the improper election of the members of the Board in each respective year.

## COUNT III
### (Derivatively Against Gumrukcu for Breach of Fiduciary Duties)

303. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

304. As a controlling shareholder, Gumrukcu owed a fiduciary duty of fairness in his financial dealings with the Company.

305. Gumrukcu, by his actions and by engaging in the wrongdoing described herein, abandoned, abdicated, and breached his fiduciary responsibilities and duties.

306. As a direct and proximate result of Gumrukcu's failure to perform his fiduciary obligations, Enochian has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

307. As a result of the misconduct alleged herein, Gumrukcu is liable to the Company and its stockholders.

308. Plaintiff, on Enochian's behalf, has no adequate remedy at law.

## COUNT IV
### (Derivatively Against the Individual Defendants and Gumrukcu
### for Contribution and Indemnification)

309. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

310. The Company's alleged liability on account of the wrongful acts and practices, as well as related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal, and/or bad faith acts or omissions of the Individual Defendants and Gumrucku.

311.     The Company has suffered significant and substantial injury as a direct result of the Individual Defendants' and Gumrucku's actions. Plaintiff, on behalf of the Company, seeks relief from the Individual Defendants and Gumrucku on a theory of contribution and indemnity to the extent that the Company is found liable for the Individual Defendants' and Gumrucku's actions.

WHEREFORE, Plaintiff respectfully requests that the Court enter an Order granting the following relief:

A.     Declaring that Plaintiff may maintain this action on behalf of Enochian and its shareholders, and that Plaintiff is an adequate representative of the Company;

B.     Declaring that the Individual Defendants and Gumrucku have breached, and aided and abetted the breach of their fiduciary duties to Enochian and its shareholders;

C.     Declaring that the Individual Defendants violated sections 14(a) of the Exchange Act;

D.     Directing the Board to take all necessary actions to reform and improve its corporate governance, internal procedures, and public disclosures to comply with applicable laws and to protect Enochian and its shareholders from a repeat of the damaging events described herein;

E.     Determining and awarding to Enochian the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants and Gumrukcu, jointly and severally, together with pre-judgment and post-judgment interest thereon;

F.     Ordering disgorgement of profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants and Gumrukcu due to their wrongful conduct and breach of their fiduciary and contractual duties, as well as any proceeds reaped through improper insider trading;

G.     Awarding Enochian restitution from the Individual Defendants and Gumrukcu, and each of them;

H.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

I.     Granting such other and further relief as may be just and equitable under the circumstances.

Dated: January 19, 2023

**Of Counsel**

**NEWMAN FERRARA LLP**
Jeffrey M. Norton
Benjamin D. Baker
1250 Broadway, 27th Fl.
New York, NY 10001
(212) 619-5400

**COOCH AND TAYLOR, P.A.**

 */s/ Blake A. Bennett*
Blake A. Bennett (#5133)
The Nemours Building
1007 N. Orange St., Suite 1120
Wilmington, DE 19801
(302) 984-3800
bbennett@coochtaylor.com

*Counsel for Plaintiff*